No. 22-13569

IN THE

UNITED STATES COURT OF APPEALS

ELEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,

     Appellee,

v.

MARION MICHAEL O'STEEN,

     Appellant.

Direct Criminal Appeal
Middle District of Florida
Lower Case No. 3:21-cr-16-MMH-JBT

---

## PRINCIPAL BRIEF OF APPELLANT

MICHAEL UFFERMAN
MICHAEL UFFERMAN LAW FIRM, P.A.
2022-1 Raymond Diehl Road
Tallahassee, Florida 32308
(850) 386-2345
FL Bar No. 114227
ufferman@uffermanlaw.com

BRYAN S. GOWDY
CREED & GOWDY, P.A.
865 May Street
Jacksonville, Florida 32204
(904) 350-0075
FL Bar No. 176631
bgowdy@appellate-firm.com
filings@appellate-firm.com

Counsel for Appellant **O'STEEN**

## B. CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The following certificate of interested persons and corporate disclosure statement is provided pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, 26.1-3, and 28-1(b):

Creed & Gowdy, P.A.; Counsel for Defendant-Appellant;

Gershow, Holly L.; Assistant United States Attorney, Deputy Chief, Appellate Division;

Gowdy, Bryan S., Counsel for Defendant-Appellant;

Grant II, Maurice C.; Counsel for Defendant Siegmeister;

Hanania, Waffa; Counsel for Defendant Siegmeister;

Handberg, Roger B.; United States Attorney;

Hoppmann, Karin; former Acting United States Attorney;

Howard, Hon. Marcia M.; United States District Judge;

Karase, Kelly; Trial Counsel for Plaintiff-Appellee;

Kent, William Mallory; Trial Counsel for Defendant-Appellant;

Kent & McFarland; Trial Counsel for Defendant-Appellant;

Lopez, Maria Chapa; former United States Attorney;

McFarland, Ryan Edward; Trial Counsel for Defendant-Appellant;

McNamara, Linda Julin; former Assistant United States Attorney, Deputy Chief, Appellate Division;

McRae, Thomas Bradley; Trial Counsel for Defendant-Appellant;

Mesrobian, David B.; Trial Counsel for Plaintiff-Appellee;

Michael Ufferman Law Firm, P.A.; Counsel for Defendant-Appellant;

Mitchell A. Stone, P.A.; Trial Counsel for Defendant-Appellant;

O'Steen, Marion Michael; Defendant-Appellant;

Rhodes, David P.; Assistant United States Attorney, Chief, Appellate Division;

Richardson, Hon. Monte C.; United States Magistrate Judge;

Siegmeister, Jeffrey Alan; Defendant;

Stone, Mitchell A.; Trial Counsel for Defendant-Appellant;

Tong, Andy; Alleged Victim;

Toomey, Hon. Joel Barry; United States Magistrate Judge;

Tran, Mai; Trial Counsel for Plaintiff-Appellee;

Ufferman, Michael; Counsel for Defendant-Appellant;

United States of America; Plaintiff-Appellee

Undersigned counsel certify that no publicly traded company or corporation has an interest in the outcome of this appeal.

## C. STATEMENT REGARDING ORAL ARGUMENT

Can a private citizen be convicted under the Hobbs Act, 18 U.S.C. § 1951, as a principal to extortion under "color of official right?" The Government answered "yes" by indicting Appellant, a private criminal defense attorney, on this theory. (Doc 1, at 14). Accepting the Government's position, the district court instructed the jury that it could convict Appellant on this theory. (Doc 160, at 27-28). But *every* circuit court of appeals to have considered this question has answered "no." *United States v. Manzo*, 636 F.3d 56, 64 (3d Cir. 2011); *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir. 1995); *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005); *United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991); *United States v. McFall*, 558 F.3d 951, 955, 959-60 (9th Cir. 2009). This Court should grant oral argument to consider whether the district court plainly erred by convicting Appellant on a legally invalid theory.

# D. TABLE OF CONTENTS

Page

A. TITLE PAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

B. CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
   DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

C. STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . .  iv

D. TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

E. TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ix

   1. Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ix

   2. Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xi

   3. Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xii

F. JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiv

G. STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

H. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

   1. Course of the Proceedings and Disposition Below. . . . . . . . . . . . . .  2

   2. Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      a. Counts One and Two: the Government's conspiracy theory
         that Mr. O'Steen bribed the prosecutor to extort Clients A,
         B, and C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      b. Count Three: the Government's theory that Mr. O'Steen
         extorted Client B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

      c. Count Four:  the Government's theory that Mr. O'Steen

v

failed to *timely* file Form 8300 . . . . . . . . . . . . . . . . . . . . . . . . 10

I.      3.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.      SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

J.      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      1.      The district court committed plain error – that was not harmless beyond a reasonable doubt – when it convicted Mr. O'Steen on Count Three, the substantive extortion charge . . . . . . . . . . . . . . . . . 17

          a.      Mr. O' Steen, a private citizen, legally cannot be convicted as a principal to extortion under "color of official right" . . . . 17

          b.      The Government cannot prove beyond a reasonable doubt that the error in instructing the jury was harmless . . . . . . . . 24

              (i).     The jury's verdict for Count Three and the harmless error standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

              (ii).    The evidence does not support the indictment's allegation that Mr. O'Steen "aided and abetted" Mr. Siegmeister's receipt of money to which he was not entitled. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

              (iii).   The jury instruction that Mr. O'Steen could be convicted of extortion through "the wrongful use of actual or threatened force [or] violence" constructively amended the indictment and therefore was not a valid legal theory. . . . . . . . . . . . . . . . . . . . . . . 27

              (iv).   The evidence did not show that Mr. O'Steen extorted Mr. Tong "through fear of economic harm". . . . . . . . . . 30

      2.      Whether the district court abused its discretion and reversibly erred by admitting highly prejudicial testimony that Mr. O'Steen

violated The Florida Bar's ethics rules.. . . . . . . . . . . . . . . . . . . . . 33

    a.    The parties' arguments and the trial court's ruling. . . . . . . . 33

    b.    Mr. Richardson's testimony . . . . . . . . . . . . . . . . . . . . . . . . 35

    c.    The district court abused its discretion by admitting Mr. Richardson's testimony, as its probative value was substantially outweighed by its dangers . . . . . . . . . . . . . . . . 36

    d.    The limiting instruction did not cure the district court's error in admitting Mr. Richardson's testimony. . . . . . . . . . . 39

    e.    The admission of Mr. Richardson's testimony was harmful error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

3.    The district court should have granted a judgment of acquittal on Count Four (untimely filing of Form 8300). . . . . . . . . . . . . . . . 44

    a.    The statutory and regulatory text, and the precedent construing the word "willfully" in the statute. . . . . . . . . . . . 44

    b.    The evidence was insufficient to prove beyond a reasonable doubt that Mr. O'Steen *willfully* failed to file a report *within fifteen days of when he received the currency* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

4.    The district court reversibly erred by improperly instructing the jury on the *mens rea* to convict under Count Four (untimely filing of Form 8300) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    a.    The district court's instruction and the parties' arguments . . 50

    b.    The district court's instruction was confusing and misleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

5.    Mr. O'Steen could not be constitutionally convicted of Count

       Four because the regulation underlying that count was not adopted by the legislative process mandated by Article I . . . . . . . . 55

K.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

L.     CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . 57

M.   CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# E.  TABLE OF CITATIONS

Page

## 1.    Cases

*Bruton v. United States*, 391 U.S. 123 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 40-41

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) . . . . . . . . . . . . . . . 38

*Evans v. United States*, 504 U.S. 255 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916 (11th Cir. 2023) . . . . . . . . . 54

*Greer v. Miller*, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41

*Griffin v. United States*, 502 U.S. 46 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gulf Life Ins. Co. v. Folsom*, 907 F.2d 1115 (11th Cir. 1990) . . . . . . . . . . . . . . 53

*Gundy v. United States*, 139 S. Ct. 2116 (2019) . . . . . . . . . . . . . . . . . . . . . . . . 55

*Hedgpeth v. Pulido*, 555 U.S. 57 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*King v. Southerton*, 6 East 126, 102 Eng. Rep. 1235 (K.B. 1805) . . . . . . . . . . . 23

*Krulewitch v. United States*, 336 U.S. 440 (1949) . . . . . . . . . . . . . . . . . . . . . . . 40

*Michelson v. United States*, 335 U.S. 469 (1948) . . . . . . . . . . . . . . . . . . . . . . . 42

*Neder v. United States*, 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ratzlaf v. United States*, 510 U.S. 135 (1994) . . . . . . . . . . . . . . . . . . . . . . . 46, 53-54

*Sanchez v. Triple-S Management, Corp.*, 492 F.3d 1 (1st Cir. 2007) . . . . . . . . . 31

*United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . 13

*United States v. Doherty*, 233 F.3d 1275 (11th Cir. 2000) . . . . . . . . . . . . . . . . . 40

*United States v. Enmons*, 410 U.S. 396 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Freedman*, 562 F. Supp. 1378 (N.D. Ill. 1983) . . . . . . . . . . 22-23

*United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . 38-39

*United States v. Gomez*, 580 F.3d 1229 (11th Cir. 2009) . . . . . . . . . . . . . . . . . 13

*United States v. Granda*, 565 F. 2d 922 (5th Cir. 1978) . . . . . . . . . . . . . 45-46, 53

*United States v. Keller*, 916 F.2d 628 (11th Cir. 1990) . . . . . . . . . . . . . . . . . 28-29

*United States v. Kurlemann*, 736 F.3d 439 (6th Cir. 2013) . . . . . . . . . . . . . 25-26

*United States v. Lander*, 668 F.3d 1289 (11th Cir. 2012) . . . . . . . . . . . . . . . . . 13

*United States v. Madden*, 733 F.3d 1314 (11th Cir. 2013) . . . . . . . . . . . . . . . . . 29

*United States v. Manzo*, 636 F.3d 56 (3d Cir. 2011) . . . . . . . . . . . . . . . . 14, 18, 20

*United States v. McClain*, 934 F.2d 822 (7th Cir. 1991) . . . . . . . . . . . 14, 19-21, 26

*United States v. McFall*, 558 F.3d 951 (9th Cir. 2009) . . . . . . . . . . . 14, 20-22, 26

*United States v. Paige*, 604 F.3d 1268 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . 13

*United States v. Percoco*, 317 F. Supp. 3d 822 (S.D.N.Y. 2018) . . . . 18, 20, 23, 26

*United States v. Phaknikone*, 605 F.3d 1099 (11th Cir. 2010) . . . . . . . . . . . . . . 42

*United States v. Rigdon*, 874 F.2d 774 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . 45

*United States v. Rodriguez Cortes*, 949 F.2d 532 (1st Cir. 1991) . . . . . . . . . . . . 43

*United States v. Saadey*, 393 F.3d 669 (6th Cir. 2005) . . . . . . . . . . . . . . 14, 18, 20

*United States v. Sampson*, 980 F.2d 883 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . 41

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Thompson*, 359 F.3d 470 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . 36

*United States v. Todd*, 108 F.3d 1329 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . 47

*United States v. Tomblin*, 46 F.3d 1369 (5th Cir. 1995) . . . . . . . . 14, 20-22, 26-27

*United States v. Waters*, 850 F. Supp. 1550 (N.D. Ala. 1994) . . . . . . . . . . . 31-32

*Yates v. United States*, 354 U.S. 298 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## 2.    Statutes

31 C.F.R. § 1010.330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

31 C.F.R. § 1010.330(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 44

31 C.F.R. § 1010.330(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 44

31 C.F.R.§ 1010.330(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

18 U.S.C. § 1951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv, 14

18 U.S.C. § 1951(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv, 14, 17

18 U.S.C. § 1951(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

26 U.S.C. § 6050I(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

31 U.S.C. § 1058 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

31 U.S.C. § 1101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

31 U.S.C. § 5322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv, 44-45

31 U.S.C. § 5322(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

31 U.S.C. § 5324(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

31 U.S.C. § 5331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv, 12, 44-46

31 U.S.C. § 5331(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

31 U.S.C. § 5331(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## 3.    Other

Art. I, U.S. Const. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16, 55

11th Cir. R. 26.1-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 26.1-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 26.1-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 28-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 28-1(i)(*i*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

11th Cir. R. 28-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

Fed. R. App. P. 4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

Fed. R. App. P. 26.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Fed. R. App. P. 28(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

Fed. R. App. 28(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

Fed. R. App. 28(a)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

Fed. R. App. 28(a)(4)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

Fed. R. App. P. 32(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Fed. R. Crim. P. 29(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Fed. R. Crim. P. 52(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35-38, 43

R. Reg. Fla. Bar 4-1.5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

R. Reg. Fla. Bar 4-1.5(f)(3)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# F. JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231 for a criminal prosecution of "offenses against the laws of the United States." The Government prosecuted Appellant under 18 U.S.C. §§ 371, 1951 and 31 U.S.C. §§ 5331, 5322. (Doc 1);[1] *see* Fed. R. App. P. 28(a)(4)(A).

This Court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal of a "final decision" by the district court. *See* Fed. R. App. 28(a)(4)(B), (D).

The judgment was filed on October 18, 2022. (Doc 215). The notice of appeal was timely filed on October 19, 2022. (Doc 210); *see* Fed. R. App. 4(b), 28(a)(4)(C).

---

[1] Record citations are to the document and page numbers generated by the electronic filing system, not the ones assigned by the court reporter. *See* 11th Cir. R. 28-5.

# G. STATEMENT OF THE ISSUES

1.      Whether the district court committed plain error – that was not harmless beyond a reasonable doubt – when it convicted Mr. O'Steen on Count Three (the substantive extortion charge) because a private citizen cannot be convicted as a principal to extortion under "color of official right."

2.      Whether the district court abused its discretion and reversibly erred by admitting highly prejudicial testimony that Mr. O'Steen violated The Florida Bar's ethics rules.

3.      Whether the district court should have granted a judgment of acquittal on Count Four (failure to timely file Form 8300).

4.      Whether the district court reversibly erred in instructing the jury on the *mens rea* required to convict Mr. O'Steen on Count Four.

5.      Whether Mr. O'Steen could be convicted on Count Four based on a violation of a law made by the executive branch (i.e., a regulation) and not made by the legislative process specified in Article I of the Constitution.

## H.  STATEMENT OF THE CASE

The Government indicted a criminal defense lawyer, Appellant O'Steen, on four counts.  (Doc 1).  The first two counts accused Mr. O'Steen of conspiring to bribe a prosecutor (his alleged co-conspirator) and to extort three of his clients.  (Doc 1, at 1-13).  The jury acquitted Mr. O'Steen of these two counts.  (Doc 162, at 1-2).

Count Three accused Mr. O'Steen of extorting one client under "color of official right" and through "fear of economic harm" to obtain a higher fee to represent the client in a state criminal case.  (Doc 1, at 14).  Count Four accused Mr. O'Steen – after receipt of a $60,000 cash fee from his client – of "*willfully* fail[ing] to file" Form 8300 "*within fifteen days after the currency is received, as prescribed by the applicable regulations*."  (Doc 1, at 15).  To obtain its convictions, the Government, subject to a limiting instruction, presented expert testimony opining that Mr. O'Steen violated two ethics rules by charging his client an excessive, contingent fee.  (Doc 246, at 49-50, 64, 68).

The convictions should be reversed because, among other reasons, Mr. O'Steen – a private citizen and criminal defense attorney – legally could not commit extortion as a principal under "color of official right."

### 1.    Course of the Proceedings and Disposition Below

Mr. O'Steen – who is presently incarcerated (11th Cir. Rule 28-1(i)(*i*)) – was

indicted for:

- Count One – Conspiracy To Use Facility Of Commerce For Unlawful Activity

- Count Two – Conspiracy To Interfere With Commerce by Extortion

- Count Three – Interference with Commerce by Extortion Under Color of Official Right

- Count Four – Failure to [Timely] File Form 8300

(Doc 1).

The sole co-defendant, Jeffrey Alan Siegmeister – a former, elected state prosecutor – also was indicted under the first three counts, as well as additional counts. (Doc 1). He pled guilty to Counts One and Two and two other counts. (Doc 79, at 1). He testified as a Government witness (Doc 240, at 38), telling the jury that Mr. O'Steen played a significant role in his election for prosecutor: "[Mr. O'Steen] actively helped me and certainly was . . . instrumental in me winning Dixie County." (Doc 240, at 55). He added that people in Dixie County who were a part of the "Good 'ol boy" network received "different treatment." (Doc 240, at 56, 75).

The jury found Mr. O'Steen not guilty of Counts One and Two and guilty of Counts Three and Four. (Docs 162; 247, at 28-29). The district court sentenced Mr. O'Steen to forty-four months' imprisonment for both counts, with the sentences to run concurrently. (Docs 215; 242, at 69).

## 2.    Statement of the Facts

a.    <u>Counts One and Two: the Government's conspiracy theory that Mr. O'Steen bribed the prosecutor to extort Clients A, B, and C</u>

For the first two counts, the Government's theory was that Mr. O'Steen conspired with Mr. Siegmeister, the prosecutor, to commit bribery and extortion. (Doc 1, at 1-13).  Specifically, the Government alleged that Mr. O'Steen bribed Mr. Siegmeister to obtain favorable results for, and to extort, his clients (A – Ronda Wyche; B – Andy Tong; and C – Doug Simpson).  (*Id*.; Doc 160, at 16).  The Government further alleged:

> b.    . . . SIEGMEISTER would and did use his position as the State Attorney to solicit, accept, and agree to accept, bribes in return for the favorable disposition of criminal cases[.]
> c.    . . . SIEGMEISTER would and did request and solicit O'STEEN to purchase a bull from SIEGMEISTER's herd of Florida Braford bulls in exchange for SIEGMEISTER's favorable disposition of criminal charges against O'STEEN's clients upon O'STEEN's request.
> d.    . . . SIEGMEISTER would and did solicit campaign contributions from O'STEEN and others in exchange for the specific official action of favorable disposition of charges filed against O'STEEN's clients.
> e.    . . . SIEGMEISTER would and did agree with O'STEEN to delay resolving cases in order to enable O'STEEN to obtain additional "fees" from at least one of O'STEEN's clients.

(Doc 1, at 4-5).  However, the Government's evidence failed to establish that Mr. O'Steen conspired with Mr. Siegmeister to commit bribery and extortion – and

therefore the jury acquitted Mr. O'Steen of the conspiracy counts. (Doc 162, at 1-2).

    b.    <u>Count Three: the Government's theory that Mr. O'Steen extorted Client B</u>

Count Three charged that Mr. O'Steen – as a principal or an accomplice to Mr. Siegmeister – by extortion obtained the property of Client B (Mr. Tong) under "color of official right and through fear of economic harm." (Doc 1, at 14). But as argued under Issue 1, Mr. O'Steen, a private citizen, legally cannot be convicted as a principal to extortion under "color of official right."

In February 2018, Mr. Siegmeister criminally charged Client B, Mr. Tong, with operating a gambling house. (Docs 1, at 3; 157-60 (Gov't Ex. 82); 240, at 152). About two weeks later, Mr. Tong and his two co-defendants retained Mr. O'Steen for a total fee of $15,000 – that is, $5,000 for each defendant. (Docs 157-48, at 1; 157-49, at 1; 157-50, at 1 (Gov't. Exs. 65-67)). Mr. O'Steen's contracts with his clients, however, allowed a charge for additional fees (above the $5,000 engagement fee) based on a variety of factors, including "the time and labor required; the complexity of the litigation; [and] the skill required to perform the legal service properly; and the experience . . . ." (Docs 157-48, at 1; 157-49, at 1; 157-50, at 1 (Gov't. Exs. 65-67)).

In April 2018, Mr. Siegmeister's initial offer to Mr. Tong, conveyed via Mr.

O'Steen, was five years of probation with a felony guilty plea. (Docs 240, at 158-63; 157-62, at 1 (Gov't Ex. 84)). However, the adjudication of guilt and probation were a "big deal" – and thus not satisfactory – to Mr. Tong because "he was trying to move on to other things in life." (Doc 240, at 187).

Four months later in August 2018 (while still being represented by Mr. O'Steen on the state criminal charges), Mr. Tong began working as a FBI confidential source. (Doc 238, at 13-14). Thereafter, the FBI and Mr. Tong surreptitiously recorded several of Mr. Tong's conversations with Mr. O'Steen. (Doc 238, at 15-16).

On August 17, 2018, Mr. O'Steen informed Mr. Tong – at a morning meeting recorded by the FBI – that he was hopeful that he could obtain a "deferred prosecution agreement," (Doc 157-29, at 3-6 (Gov't Ex. 38)), also known as "pretrial intervention" or PTI (Doc 240, at 89). But Mr. Tong would need to pay Mr. O'Steen $60,000 to "make [it] go away":

> O'Steen: So you're saying, for example, if I gave you a number of sixty thousand dollars and I make yours go away completely, and you're out of here, you can handle that without any agreement? You asked for the number. I don't know if it'll fly or not.
>
> [Tong]: Well what does it take . . . I know you're going to go meet up with . . .
>
> O'Steen: I'm going today [to meet with Mr. Siegmeister] . . . I'm not going to pay him off. So I don't want you to think that. . . . I mean I'm not going to bribe him. I'm going to go explain to him I got to eat

around here. . . . You're saying you could probably come up with more than thirty if I can make yours go away without an agreement, is that would you're telling me?

    . . . .

O'Steen: You want a price to make it go away? . . . Let me go over there and talk to him and get a good feel for where, I mean.

[Tong]: Yeah, that's what I want to hear.

(Doc 157-29, at 5-6 (Gov't. Ex. 38A)).

Later that same afternoon (August 17, 2018), Mr. O'Steen and Mr. Tong spoke

several times by telephone. (Docs 157-34, at 2-3; 157-35, at 2-3; 157-36, at 2-3

(Gov't. Exs. 43A, 44A, 45A)). After Mr. Tong insinuated that his fee to Mr. O'Steen

would be used to bribe Mr. Siegmeister, Mr. O'Steen forcefully and repeatedly

rejected this insinuation; for example:

> . . . There's no bribe going on. I don't want no insinuation of that. But you're payin' me to use the people that I know to make . . . you won't ever have to go to court to get three felonies dropped. The lowest I'm going to get the results for is sixty-thousand dollars. . . .
>
>     . . . .
>
> That's good as I'm gon' do. That's as good as it's gon' get and that's not a payoff. I've got people that will pay for those favors, and I'm not gon' burn em' up and not get paid for it.
>
>     . . . .
>
> Bottom line, Andy, if you want me to do it, it's sixty-thousand dollar additional retainer for Michael [O'Steen]. I'm not paying the State

Attorney a one red cent.

. . . .

But, but either way. That's what it's gon' take. And I'm not movin', budgin', I can probably get the other two dismissed, but you're gon' have to do probation otherwise. Or you can go to trial and fight em' out, which I don't think you can win.

. . . .

I am not burnin' up a favor that I [unintelligible] can get somebody to pay for good money to make cases go away. I'm not gon' burn that favor up.

. . . .

Andy, . . . if you don't trust me, I'll try and send you somewhere else, but you're not gone' get the results.

(Doc 157-36, at 2-4; Gov't. Ex. 45A)).

In his testimony for the Government (Doc 240, at 38-258), Mr. Siegmeister confirmed that he and Mr. O'Steen met that same day (August 17, 2018) and that they discussed Mr. Tong's "PTI" and the "$60,000" that Mr. O'Steen would "get paid on the case." (Doc 240, at 192-93). Three days later, on August 20, 2018, Mr. O'Steen in a recorded call explained to Mr. Tong the details of the agreement offered by Mr. Siegmeister. (Doc 157-30 (Gov't. Ex. 39A)). Among other things, Mr. O'Steen explained the agreement would require Mr. Tong to pay approximately $7,500 in restitution, but, Mr. O'Steen clarified, "[t]hat has nothing to do with the sixty that I'm

gonna charge you." (Doc 157-30, at 5 (Gov't Ex. 39A)). Ultimately, the Government

provided $60,000 to Mr. Tong who, in turn, paid Mr. O'Steen the first $30,000 on

August 23, 2018 and the second $30,000 on September 4, 2018. (Doc 238, at 39).

Through the testimony of FBI Agent Blythe, the Government played for the

jury these, and several other, recorded conversations between Mr. O'Steen and Mr.

Tong, occurring in August and September 2018, in which they discussed Mr. Tong's

PTI agreement and the attorney's fee he had to pay Mr. O'Steen.[2] (Docs 157-28 to

44 (Gov't Exs. 38/A-53/A); 238, at 214-36; 239, at 6-32). The Government's

prosecutor, in her opening, summarized this evidence:

> [T]he defendant, who is Mr. Tong's lawyer, told him that thanks
> to his relationship with the prosecutor, Mr. Tong could resolve his case
> to something called pretrial intervention, or PTI, which would mean no
> felony conviction and not even any probation.
>
> But what the defendant demanded to complete that deal for a PTI
> was $60,000, on top of the $15,000 he had already been paid. No
> $60,000, no PTI. Go to trial, take the felony plea, or pay him that
> money.
>
> . . . .
>
> [Y]ou're going to listen to [the FBI's recordings] and you're
> going to hear those words straight out of the defendant's mouth. And
> you're going to watch the defendant take two $30,000 cash payments

---

[2] The Government also presented text messages from Mr. O'Steen's and Mr.
Siegmeister's cell phones, by which they communicated with each other and Mr.
O'Steen communicated with Mr. Tong. (Docs 157, at 2-3; 157-19 to 157-27 (Gov't.
Exs. 26-34)).

from Mr. Tong in separate meetings so that he would complete that deal for a PTI.

(Doc 237, at 39-40).

But the prosecutor did not stop with the FBI recordings. In the same breath, she told the jury it should listen to expert testimony opining that Mr. O'Steen had violated The Florida Bar's ethics rules by charging Mr. Tong the $60,000 fee:

> You're going to hear from an expert witness. You'll learn that not only was $60,000 an excessive fee for simply obtaining a PTI agreement with no more additional work, but that is not permissible in criminal cases for an attorney to charge a client more to obtain a particular outcome.

(Doc 237, at 40-41). Indeed, near the end of the Government's case-in-chief, Mr. Richardson – an attorney expert witness – opined that Mr. O'Steen's collection of the additional $60,000 fee from Mr. Tong violated The Florida Bar's ethics rules. (Doc 246, at 49-50, 64).

c. Count Four: the Government's theory that Mr. O'Steen failed to *timely* file Form 8300

Count Four alleged that Mr. O'Steen "received more than $10,000 in currency," and that he "did willfully fail to file a . . . Form 8300 . . . within fifteen days after the currency [was] received, as prescribed by the applicable regulations." (Doc 1, at 15). As argued later, the Government had to prove that Mr. O'Steen *knew* it was unlawful to fail to file Form 8300 *within fifteen days after the currency was*

*received*. To meet its burden, the Government presented the testimony of: (i) Jolie Garner, a teller from Mr. O'Steen's bank (Doc 245, at 219-31, 234-35), and (ii) Craig Castiglia, an IRS agent (Doc 246, at 128-78, 192-94).

In October 2018, Mr. O'Steen came to Ms. Garner's window, deposited $9,900 in cash, and then asked, "How much until the IRS finds out?" (Doc 245, at 228-29). When Ms. Garner attempted to hand him the Currency Transaction Reporting (CTR) pamphlet, he refused it and said "he already knew what it said." (Doc 245, at 229). The pamphlet stated that federal law requires institutions to report cash transactions exceeding $10,000. (Docs 245, at 225-26; 157-74, at 1-2 (Gov't. Ex. 104)). Yet, the pamphlet does *not* state what federal law mandates as to the *timing* of the report. (Docs 245, at 232-34; 157-74, at 1-2 (Gov't. Ex. 104)).

Agent Castiglia testified that Mr. O'Steen filed the Form 8300 on May 14, 2019 – eight months after he received the $60,000 in cash and six days after he had learned of the Government's investigation. (Docs 246, at 157-159, 190-91; 157-78 (Gov't. Ex. 108)). The agent also testified that in 2013, Mr. O'Steen took an online course that lasted two-and-half hours (Docs 246, at 166-172, 187; 157-82 to 86 (Gov't. Exs. 113, 113A, 113B, 114A), which included a 30-second clip that said:

> If a lawyer gets paid cash do you have to reveal that? Yes. There are
> federal laws that say lawyers have to reveal cash over ten thousand
> dollars even though it is very bad for the client to tell the federal

government that you got ten thousand dollars in cash from them. But you are required by law to do it.

(Doc 157-83 (Gov't. Ex. 113A)).

The Government moved into evidence a blank Form 8300. (Docs 246, at 149; 157-95 (Gov't. Ex. 131)). It had three pages of instructions of approximately 3500 words. (Doc 157-95, at 3-5 (Gov't. Ex. 131)). Seventeen of those words state: "**When to file.** File Form 8300 by the 15th day after the date the cash was received." (Docs 157-95, at 3; 246, at 186). But the Government did not present any evidence that Mr. O'Steen had read these words, or that he had possessed or reviewed a Form 8300 before May 2019.

Finally, Agent Castiglia testified that a statute "provides a link right there online as to the requirements for the time of the filing." (Doc 247, at 88). The agent attested that 31 U.S.C. § 5331 "references 6050i of the Internal Revenue Code" and "[y]ou have to click on the hyperlink." (Doc 246, at 186). Though section 5331(a)(2) does cross reference 26 U.S.C. § 6050I(g), the latter provision does not state *when* the Form 8300 must be filed. Instead, a Treasury regulation says *when* such a form must be filed. 31 C.F.R. § 1010.330(a).

### 3.    Standard of Review

Issue 1: Because this issue was not argued below, this Court reviews for plain error. This Court may reverse if (1) there is an error that: (2) is plain, (3) has affected

the defendant's substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See* Fed. R. Crim. P. 52(b).

Issue 2:  The Court reviews rulings on the admissibility of evidence for abuse of discretion. *See United States v. Todd*, 108 F.3d 1329, 1332 (11th Cir. 1997).  "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).

Issue 3:  This Court reviews *de novo* a denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the Government.  The evidence is sufficient if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *See, e.g., United States v. Lander*, 668 F.3d 1289, 1297 (11th Cir. 2012).

Issue 4:  This Court reviews "*de novo* the jury instructions given . . . 'to determine whether they misstate the law or mislead the jury to the objecting party's prejudice.'" *See United States v. Gomez*, 580 F.3d 1229, 1233 (11th Cir. 2009) (reversing for failing to instruct the jury on the *mens rea* required to convict).

Issue 5:  This Court reviews *de novo* questions of constitutional law. *United States v. Paige*, 604 F.3d 1268, 1274 (11th Cir. 2010).

# I. SUMMARY OF ARGUMENT

1.     The Government charged Mr. O'Steen, a private citizen, as a principal to extortion under "color of official right" pursuant to the Hobbs Act, 18 U.S.C. § 1951 (Count Three).  However, this theory of prosecution – which was the central theme of the Government's case – is a legally invalid theory, as *every* circuit court of appeals to have considered the issue has held that extortion under "color of official right" requires that the defendant be a "public official," i.e. a person who holds an official position within the government."  *See United States v. Manzo*, 636 F.3d 56, 64 (3d Cir. 2011); *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir. 1995); *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005); *United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991); *United States v. McFall*, 558 F.3d 951, 955, 959-60 (9th Cir. 2009).  Thus, the district court plainly erred when it instructed the jury on the Government's legally invalid theory.  And the Government cannot prove beyond a reasonable doubt that the error in instructing the jury was harmless because all of the alternative theories of extortion were unsupported by the evidence or legally invalid.  The Court should therefore reverse the conviction for Count Three and remand for a new trial.

2.     Alternatively, Mr. O'Steen is entitled to a new trial on Count Three because the district court reversibly erred by admitting highly prejudicial testimony

whose probative value was substantially outweighed by its dangers. Near the end of the Government's case-in-chief, attorney Scott Richardson opined that Mr. O'Steen's collection of the additional $60,000 fee from Mr. Tong violated The Florida Bar's ethics rules. Mr. Richardson's testimony gave rise to the risk that the jury would improperly convict Mr. O'Steen based on evidence of his violation of the ethics rules rather than the crimes charged in the indictment.

3.      For Count Four (failure to timely file Form 8300), Mr. O'Steen was entitled to acquittal. Count Four alleged that Mr. O'Steen "received more than $10,000 in currency," and that he "did *willfully* fail to file a . . . Form 8300 . . . *within fifteen days after the currency is received, as prescribed by the applicable regulations*." (Doc 1, at 15) (emphasis added). The Government did not prove beyond a reasonable doubt that Mr. O'Steen *knew* that it was unlawful to fail to file Form 8300 *within fifteen days after the currency was received*.

4.      Alternatively, Mr. O'Steen is entitled to a new trial on Count Four because the district court failed to properly instruct the jury on the *mens rea*. Because the Government was required to prove Mr. O'Steen knew of the 15-day reporting requirement set forth in 31 C.F.R. § 1010.330(b)(1), the district court erred by failing to instruct the jury – as requested by defense counsel – that it had to find that Mr. O'Steen knew of the 15-day requirement.

5. Finally, Mr. O'Steen could not be constitutionally convicted of Count Four because the regulation underlying that count was not adopted by the legislative process mandated by Article I.

# J. ARGUMENT

**1.    The district court committed plain error – that was not harmless beyond a reasonable doubt – when it convicted Mr. O'Steen on Count Three, the substantive extortion charge.**

a.    <u>Mr. O'Steen, a private citizen, legally cannot be convicted as a principal to extortion under "color of official right"</u>

Count Three charged Mr. O'Steen under the Hobbs Act, 18 U.S.C. § 1951,[3] as a principal and an accomplice, of extorting Client B (Mr. Tong) under "color of official right" *and* "through fear of economic harm" *but not* "through fear of force or violence":

> JEFFREY ALAN SIEGMEISTER
> and
> MARION MICHAEL O'STEEN,
> aiding and abetting each other, did knowingly obstruct, delay, and affect, and attempt to obstruct, delay, and affect, . . . commerce . . . by extortion, as such terms are defined in 18 U.S.C. § 1951, that is, the defendants, acting in concert with one another, obtained property not due defendants, from Client B with Client B's consent, *under color of official right and through fear of economic harm.*

(Doc 1, at 14) (emphasis added).

Yet, as multiple circuit courts have held, a private citizen like Mr. O'Steen

---

[3] 18 U.S.C. § 1951 provides, "Whoever . . . obstructs, delays, or affects commerce . . . by . . . extortion . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). "Extortion" is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

legally cannot be convicted as a principal to committing extortion under "color of official right." *United States v. Percoco*, 317 F. Supp. 3d 822, 828-29 (S.D.N.Y. 2018) (collecting cases) ("Every circuit that has squarely considered this issue has held that, as general matter, extortion under color of official right requires that the defendant be a 'public official,' that is, a person who holds an official position within the government."); *see also, e.g.*, *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005) ("[A] private citizen who is not in the process of becoming a public official may be convicted of Hobbs Act extortion under the 'color of official right' theory only if that private citizen either conspires with, or aids and abets, a public official in the act of extortion."); *United States v. Manzo*, 636 F.3d 56, 64 (3d Cir. 2011) ("[B]ecause the Manzos neither acted nor pretended to act in an official capacity, their conduct was not "under color of official right.").

The district court nevertheless instructed the jury that Mr. O'Steen could be convicted of "committing" extortion as a principal:

> Count Three charges the Defendant *with committing* or aiding and abetting the commission of the substantive offense of . . . extortion....
> The Defendant can be found guilty . . . only if all the following facts are proved beyond a reasonable doubt:
>
> (1) the Defendant caused Client B (Andy Tong) to part with property;
> (2) *the Defendant did so knowingly by using extortion or extortion under color of official right*; and

(3) the extortionate transaction delayed, interrupted, or affected interstate commerce.

. . . .

"Extortion under color of official right" is the wrongful taking or receipt of money or property by a public officer who knows that the money or property was taken or received in return for doing an official act. . . . To qualify as an official act, the public official must have made a decision or taken an action, or agreed to make a decision or take an action on a question, matter, cause, suit, proceeding, or controversy.

(Doc 160, at 27-28) (emphasis added). This jury instruction was plainly erroneous because Mr. O'Steen, a private citizen, legally could not be convicted of "committing" extortion – i.e., being a principal to extortion – under "color of official right." *See, e.g., United States v. McClain*, 934 F.2d 822, 831 (7th Cir. 1991) ("[P]roceeding against private citizens on an 'official right' theory is inappropriate under . . . the Hobbs Act . . . .").

The "official right" theory of extortion imposes liability on "a public official [who] has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States*, 504 U.S. 255, 268 (1992). In "official act" extortion, the defendant's public office supplies the necessary element of coercion. *Id.* at 266. A public office gives a defendant the power to convey the threat (explicitly or implicitly) that "failure to make a payment will result in the victimization of the prospective payor or the withholding of more

favorable treatment" in the form of official action. *Id.* at 274-75 (Kennedy, J., concurring). That threat, if properly understood, coerces the victim to give over property not legitimately owed to the person holding public office – thus completing the offense. *Id.* at 268.

Every circuit court of appeals to have considered the issue has agreed that extortion under color of official right requires that the defendant be a "public official." *Percoco*, 317 F. Supp. 3d at 828 (citing *Manzo*, 636 F.3d at 64-65 (3d Cir.); *United States v. McFall*, 558 F.3d 951, 955, 959-60 (9th Cir. 2009); *Saadey*, 393 F.3d at 675 (6th Cir.); *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir. 1995); *McClain*, 934 F.2d at 830-31 (7th Cir.)). "These courts have held that the defendant need not actually have the powers he threatens to use, but he must in some sense be on the government payroll or otherwise hold an official position."[4] *Id.* (internal quotations omitted).

Relevant to Mr. O'Steen's case, three circuit courts have considered "whether a private citizen can commit the offense if, through his influence, he wields such extensive control over public officials that, *de facto*, he exercises governmental

---

[4] While courts in *dicta* "have left open the possibility that private citizens could commit extortion under color of official right," those exceptions do not apply here. *See Percoco*, 317 F. Supp. 3d at 828 (noting circuit courts have recognized exceptions for when a defendant is "in the process of becoming a public official" or is "masquerading" as or "pretending" to be a public official).

power." *Id.* at 829 (citing *McFall*, 558 F.3d at 959-60; *Tomblin*, 46 F.3d at 1383; *McClain*, 934 F.2d at 831). "Each court [of appeals] held that 'proceeding against private citizens on an "official right" theory is inappropriate under the literal and historical meaning of the Hobbs Act, irrespective of the actual "control" that citizen purports to maintain over governmental activity.'" *Id.* (quoting *McFall*, 558 F.3d at 958 and citing *Tomblin*, 46 F.3d at 1383 and *McClain*, 934 F.2d at 831).

First up is the Seventh Circuit's *McClain* case. There, the defendant – the mayor's former aide – accepted payments in exchange for assisting the payer to win a city contract. 934 F.2d at 824. Although the defendant held no official position, he "boasted colorfully of the power he wielded over city contract awards," *id.*, and he had a "vise-like grip on power" within city government, *id.* at 830-31. In exchange for payments from a private collection agency, the defendant lobbied and bribed city officials to award the agency a contract to collect the city's parking tickets. *Id.* at 824. The Seventh Circuit held it was "improper to have charged [the defendant] under the official right prong of the Hobbs Act," *id.* at 831, because he was "at all relevant times a private citizen" for purposes of the statute, *id.* at 829.

Next up is the Ninth Circuit's *McFall* case. The defendant there wielded extensive control within state and local government as a private lobbyist and was convicted of attempted extortion under color of official right. *See* 558 F.3d at 954.

State officials told bribe payers that the defendant "spoke for" them and that state contracts "would not materialize without [his] help." *Id.* at 953-55. The Ninth Circuit reversed the defendant's conviction because he "made no claim of official right," but rather claimed only "to have outsized political influence." *Id.* at 959.

Last in the trilogy is the Fifth Circuit's *Tomblin* case. A private citizen, who was a senator's close friend, was convicted of extortion under color of official right because he solicited payments in exchange for influencing the senator to expedite legislation. 46 F.3d at 1374-75. The Fifth Circuit reversed. *Id.* at 1383. Because the defendant's influence was not "official power," but rather was "unofficial power over an official," the Hobbs Act did not reach his conduct. *Id.*

This principle from these circuit court cases – a private citizen cannot commit extortion under "color of official right" – also apples to private attorneys who represent criminal defendants. In *United States v. Freedman*, 562 F. Supp. 1378 (N.D. Ill. 1983), two attorneys obtained $3,000 from their client, a state criminal defendant, and told him it would be used to bribe the judge (though the bribery never occurred). *Id.* at 1380. Unknown to the attorneys, their client was cooperating with law enforcement, which provided the $3,000. *Id.* Like the Government's theory here, the government in *Freedman* argued that, under a "color of official right" theory, it could prosecute attorneys "who extort money from their client based upon their representations that the money will be used to bring about a favorable judicial

decision." *Id.* at 1384. In a thorough opinion, the court rejected the government's theory as contrary to the text and legislative history of the Hobbs Act, as well as caselaw and the common law on which the Hobbs Act was based. *See id.* at 1384-90; *see also King v. Southerton*, 6 East 126, 142, 102 Eng. Rep. 1235 (K.B. 1805) (Lawrence, J.) ("The question then is whether it be an offence at common law to threaten another that he will procure a public officer to prosecute him, unless he give [sic] him money? It has been decided in many cases, that . . . it is not indictable....").

In accordance with these well-reasoned decisions, a private citizen, as a matter of law, cannot be convicted as a principal to extortion under a "color of official right." Because Mr. O'Steen indisputably was not a "public official," the district court erred by instructing the jury that Mr. O'Steen could be convicted as a principal to extortion under a "color of official right." This error was plain and obvious. *Cf. Percoco*, 317 F. Supp. 3d at 826 (the district court *sua sponte* asked the parties, before submitting the case to the jury, to address whether the extortion count had to "be dismissed because Percoco did not hold any official position at the time that he received payments"). The error also affected Mr. O'Steen's *substantial rights, and it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. S*ee Fed. R. Crim. P. 52(b). Accordingly, this Court should reverse, unless the Government proves beyond a reasonable doubt that the plain error was harmless (which it cannot do).

b.  The Government cannot prove beyond a reasonable doubt that the error in instructing the jury was harmless

Because the district court plainly erred in instructing the jury on a legally invalid theory, the Government bears the burden of proving beyond a reasonable doubt that the error did not contribute to the verdict.  The Government cannot satisfy its burden because all the alternative theories of extortion were unsupported by the evidence or legally invalid.

(i).  The jury's verdict for Count Three and the harmless error standard

The district court's verdict form allowed the jury to find Mr. O'Steen guilty of Count Three without specifically finding whether he was guilty of committing extortion (a legally invalid theory) *or* aiding and abetting extortion (a legally valid theory):

> 5.  With regard to Count Three of the Indictment, which charges the Defendant with Interference With Commerce by Extortion, we, the Jury, find MARION MICHAEL O'STEEN:
>             NOT GUILTY __ GUILTY X
>
> . . . .
>
> 6.   We, the jury, unanimously find MARION MICHAEL O'STEEN committed *or* aided and abetted the commission of the following ( choose one):
>      __ Extortion
>      __ Extortion Under Color of Official Right
>      X  Both Extortion and Extortion Under Color of Official Right

(Doc 162, at 3) (emphasis added).

24

When a jury is instructed that it may convict on one of two legal theories, one erroneous and one proper, the possibility that it could choose to convict on the permissible theory does not necessarily save a general guilty verdict from reversal. *See Yates v. United States*, 354 U.S. 298, 312 (1957). "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law," and "there is no reason to think that their own intelligence and expertise will save them from that error." *Griffin v. United States*, 502 U.S. 46, 59 (1991).

Such *Yates* errors are not necessarily harmless especially where, as here, the legally invalid theory is "front and center" in the Government's case-in-chief. As Judge Sutton for the Sixth Circuit has explained:

> That is not to say that harmless error may never occur when a jury is instructed on alternative legal theories, one incorrect, one correct. It may – if, to use one example, the error related to an uncontroverted point. *See Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008). Even then, the government must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict." *Neder v. United States*, 527 U.S. 1, 15 (1999). No such showing was made here. The government's half-truth theory, presumably because it was the easier of the two theories to establish, appeared front and center during Kurlemann's trial, including during closing argument when the government told the jury that Kurlemann's "[c]oncealement, this nondisclosure, it is a common thread," . . . and then implored the jury to hold Kurlemann accountable for "the things that he said, the lies that he made, the half truths" he told. . . . The district court . . . thought the half-truth instruction was critical. . . . On this record, no harmless error occurred. As a result, we reverse Kurlemann's conviction and remand

for retrial.

*United States v. Kurlemann*, 736 F.3d 439, 450 (6th Cir. 2013).

As in *Kurlemann*, the Government here made the legally invalid theory "front and center" in its case-in-chief – and thus not harmless. The Government's very first words in its closing argument prove this point:

> Ladies and gentlemen of the jury, burning up favors, the shakedown of a client, and a culture of corruption.
>
> Michael O'Steen worked harder than anybody to put Siegmeister in the position of the State Attorney. From the inception of Siegmeister's candidacy for State Attorney, the defendant saw an opportunity. He reached out to Siegmeister and worked to get Siegmeister elected. He took him around. He introduced him to people. He got petitions signed. He wrote campaign checks. And the defendant was quick to remind Siegmeister of that when he could use his friend's position to get paid or to get what he wanted.
>
> In a good 'ol boy network where who you know is everything, O'Steen needed Siegmeister to get the results to fill his pockets and build his book of business.

(Doc 247, at 68). The Government's theory – that was "front and center" in its closing argument – is indistinguishable from the theories rejected as legally invalid by the circuit courts in *McFall*, *Tomblin*, and *McClain*. *See Percoco*, 317 F. Supp. 3d at 829 (explaining that, in *McFall*, *Tomblin*, and *McClain*, the government's theories were that the defendant "through his influence, . . . wield[ed] such extensive control over public officials that, *de facto*, he exercise[d] governmental power"). Accordingly, the Government cannot prove beyond a reasonable doubt that the plain error was harmless.

(ii). <u>The evidence does not support the indictment's allegation that Mr. O'Steen "aided and abetted" Mr. Siegmeister's receipt of money to which he was not entitled</u>

While universally rejecting the notion that a private citizen can commit "official right" extortion as a principal, courts have acknowledged that a private citizen can "aid[] and abet[] a public official's receipt of money to which he was not entitled." *E.g., Tomblin*, 46 F.3d at 1382. But the evidence presented below did not show any theory that Mr. O'Steen aided and abetted a public official's receipt of money to which he was not entitled. Such a theory would have required the Government to prove that the "public official" – Mr. Siegmeister, the prosecutor – received money from the alleged victim to which the official was not entitled. *See id.* The Government, however, did not establish that Mr. Siegmeister received any of the $60,000 that Mr. Tong paid to Mr. O'Steen. Moreover, the Government's aiding and abetting allegation was that Mr. O'Steen and Mr. Siegmeister "act[ed] in concert with one another." (Doc 1, at 14). The jury's acquittal of Mr. O'Steen of Count Two (conspiracy to extort) indicates that the Government failed to prove that Mr. O'Steen and Mr. Siegmeister "act[ed] in concert with one another."

(iii). <u>The jury instruction that Mr. O'Steen could be convicted of extortion through "the wrongful use of actual or threatened force [or] violence" constructively amended the indictment and therefore was not a valid legal theory</u>

Four alternative bases exist under the statute by which a person can commit

extortion: (1) force, (2) violence, (3) fear, or (4) under color of official right. *See* 18 U.S.C. § 1951(b)(2) (defining extortion as "the obtaining of property from another . . . induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"). Count Three of the indictment alleged two alternatives – (1) under color of official right and (2) fear:

> [Mr. O'Steen] obtained property not due defendant[], from Client B . . . under color of official right and through fear of economic harm.

(Doc 1, at 14). However, the district court's jury instruction added the uncharged "force" and "violence" alternatives:

> "Extortion" means obtaining property from a person who consents to give it up because of *the wrongful use of actual or threatened force, violence*, or fear. "Fear" means a state of anxious concern, alarm, or anticipation of harm. It includes the fear of financial loss as well as fear of physical violence.

(Doc 160, at 27-28) (emphasis added).

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." This Court has recognized that a "fundamental principle stemming from [the] amendment is that a defendant can only be convicted for a crime charged in the indictment." *United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990). This is so because:

> It would be fundamentally unfair to convict a defendant on charges of

which he had no notice. . . .  When a defendant is convicted of charges not included in the indictment, an amendment of the indictment has occurred. . . .  [A]n amendment is *per se* reversible error . . . .

*Id.*  An impermissible, constructive "amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *Id.* at 634.

The district court's jury instruction for Count Three modified the essential elements of the extortion charge in the indictment and broadened the possible bases for conviction beyond that alleged in the indictment, thereby resulting in a constructive amendment of the indictment that amounts to plain error. *See United States v. Madden*, 733 F.3d 1314, 1322-23 (11th Cir. 2013) (reversing for plain error because of a constructive amendment to the indictment).  And during its rebuttal closing argument, the Government emphasized the uncharged "force" alternative (i.e., the "threatened force" that if Mr. Tong proceeded to trial, he would lose and thereafter be imprisoned):

> "You can go to trial and fight 'em out, which I don't think you can win."  That's the statement that was made.

(Doc 247, at 134).[5]  Thus, the uncharged "force" and "violence" alternatives were not

_____

[5] The district court also mentioned this statement during the sentencing hearing:

> And I found it particularly concerning the specific recorded call in which Mr. O'Steen was threatening his own client, telling the client

valid legal theories in this case.

(iv). The evidence did not show that Mr. O'Steen extorted Mr. Tong "through fear of economic harm"

Count Three alleged the alternative basis of extortion that Mr. O'Steen obtained property from Mr. Tong "through fear of economic harm." (Doc 1, at 14). Under the statute, this alternative requires the Government to prove that the obtaining of the property was induced by the "wrongful" use of fear of economic harm. *See* 18 U.S.C. § 1951(b)(2). In this case, the Government's evidence failed to establish that Mr. O'Steen's obtainment of Mr. Tong's property was induced by the wrongful use of fear of economic harm.

As a preliminary matter, Mr. Tong had no fear of losing the $60,000 that was paid to Mr. O'Steen. The $60,000 was not Mr. Tong's money – it was the FBI's money. (Doc 238, at 39).

More importantly, Mr. O'Steen's actions in collecting a legal fee were not "wrongful";[6] rather, it was Mr. Tong's conduct that created the fear of economic harm. For the "fear of economic harm" alternative basis, the Government's theory

---

he could go to trial but he would lose . . . .

(Doc 243, at 64).

[6] As explained under Issue 2, Mr. O'Steen was severely prejudiced by the Government's expert testimony that his fee violated The Florida Bar's ethics rules.

was that the payment of a legal fee amounted to the fear of economic harm. But the mere payment of a legal fee to a defense lawyer by a client who has been charged with a crime does not amount to "wrongful" conduct – such transactions occur countless times every day. Furthermore, it was *Mr. Tong's conduct* in committing a crime (operating an illegal gambling house)[7] that created the "fear of economic harm" (i.e., the need to retain a criminal defense lawyer).

As explained by the First Circuit, "'fear' [under the Hobbs Act] includes 'economic fear,' but only if the fear is independently shown to be 'wrongful,' because 'there is nothing inherently wrongful about the use of economic fear to obtain property,' as opposed to the use of threatened force or violence to do so." *Sanchez v. Triple-S Management, Corp*., 492 F.3d 1, 12 (1st Cir. 2007). "For this reason, 'economic fear is wrongful under the Hobbs Act *only if the [alleged victim] had a pre-existing statutory right to be free from the defendant's demand' for the property*." *Id.* (emphasis added). In the instant case, there was nothing "wrongful" about Mr. O'Steen, an attorney, demanding a fee from his client – at least for purposes of the Hobbs Act. *See also United States v. Waters*, 850 F. Supp. 1550, 1559 (N.D. Ala. 1994) ("Congress included the word 'wrongful' in the Hobbs Act because not every

---

[7] Mr. Tong indisputably was properly charged with a crime by Mr. Siegmeister following Mr. Tong's illegal activity.

threat of economic harm is *wrongful*. The fact that Phifer recorded the Waters' 'confession' that their preparation of the fake invoices that Phifer demanded of them was 'illegal' did not make 'wrongful' the entirely separate conduct described in Count One. Whether or not it is a shameful fact, it is nevertheless a fact that threats of economic harm are used every day as tools in the business world; only a few of them are extortionate.") (citing *United States v. Enmons*, 410 U.S. 396, 398-402 (1973)) (emphasis in the original).

Accordingly, the evidence did not support the allegation that Mr. O'Steen extorted Mr. Tong "through fear of economic harm."

\*\*\*\*\*\*

In sum, the district court plainly erred by instructing the jury that Mr. O'Steen could be convicted as principal to extortion under "color of official right." The Government cannot meet its burden of proving beyond a reasonable doubt that the error did not contribute to the verdict. The focus of the Government's presentation for Count Three was that Mr. O'Steen was guilty as principal to extortion under "color of official right." The Court cannot be confident that the jury convicted Mr. O'Steen for any reason other than this invalid legal theory. This Court should reverse Mr. O'Steen's conviction for Count Three.

**2. Whether the district court abused its discretion and reversibly erred by admitting highly prejudicial testimony that Mr. O'Steen violated The Florida Bar's ethics rules.**

a.   <u>The parties' arguments and the trial court's ruling</u>

Before trial, the Government announced its intention to present the expert testimony of attorney Scott Richardson. (Doc 55). Mr. O'Steen later moved to exclude this testimony under Federal Rule of Evidence 403:

> Evidence, testimony, and argument relating to violation of the Florida Bar ethics rules . . . would not be relevant to the criminal offenses charged and would unfairly place O'Steen's character at issue and thereby prejudicially deny O'Steen's right to a fair trial and due process of law. Admission of any such evidence would violate Rule 403 [] because whatever probative value it could have, if any, would be substantially outweighed by the danger of unfair prejudice to O'Steen by confusing and misleading the jury to think that O'Steen is being charged with ethical violations. Furthermore, it would paint O'Steen as an unethical person which would cause the jury to believe that O'Steen is inclined to participate in an extortion or bribery scheme.

(Doc 93, at 2-3).

At a pretrial hearing, Mr. O'Steen's counsel reiterated this argument:

> There would be the risk that the jury would confuse an ethical violation with a criminal violation, that the jury would commingle the two concepts, that somehow the two are the same, when it – because it is our position that the evidence of the ethical violation doesn't go to any of the elements of the crimes charged. . . . [The jurors] are not lawyers and could easily confuse the two.

(Doc 118, at 5).

In response, the Government argued Mr. Richardson's testimony was relevant because the jury needed to know that Florida criminal defense lawyers may not use contingent fee contracts:

> It is relevant because jurors may assume, you know, from watching – we've all seen plaintiffs' lawyers' commercials on TV: You don't get paid till I get paid.
>
> . . . .
>
> And the testimony that this – that contingent fees that are dependent upon the outcome are not within the bounds of the rules of professional conduct is relevant because it goes to Mr. O'Steen's intent to commit extortion.

(Doc 118, at 16).

At the hearing's conclusion, the district court denied the motion in limine – and ruled that Mr. Richardson could testify that Mr. O'Steen violated the ethics rules:

> With respect to the ethical rules, I think the motion is due to be denied. I do think they're relevant to the question of whether it was whether the payment and the receipt of the money was wrongful under the – for purposes of the elements of the extortion claim as to Client B.

(Doc 118, at 35). The district court, however, said at the pre-trial hearing that it would be "happy to consider a limiting instruction." (Doc 118, at 35). At trial, the parties and the district court agreed to the wording and timing of such an instruction. (Docs 237, at 7-9; 246, at 51, 69).

b.    Mr. Richardson's testimony

The Government called Mr. Richardson during its case-in-chief.  (Doc 246, at 34-35).  Mr. Richardson testified that he is a board-certified criminal trial lawyer who: (1) previously served as the "second-in-command" prosecutor in the Palm Beach County State Attorney's Office; (2) was currently in private practice as a criminal trial lawyer; and (3) also represented lawyers and judges who had been accused of violating The Florida Bar's ethics rules.  (Doc 246, at 37-48).

Mr. Richardson told the jury that Mr. O'Steen had violated The Florida Bar's ethics rules:

> A.   My opinion is that two rules of professional conduct were violated.
>
> Q [by the prosecutor].   And tell us about those one at a time, please.
>
> A.   All right.   They are Rule 4-1.5(a) with regard to greatly excessive fees and 4-1.5(f)(3)(B) regarding contingent fees in criminal cases.
> . . . .
>
> Q.   And in your expert opinion, is a $60,000 fee under these circumstances appropriate for the pretrial intervention or the deferred prosecution option?
>
> A.   I felt it was clearly excessive.

(Doc 246, at 49-50, 64).[8]

---

[8] Defense counsel renewed the Rule 403 objection at trial.  (Doc 246, at 50-51).

c. __The district court abused its discretion by admitting Mr. Richardson's testimony, as its probative value was substantially outweighed by its dangers__

The probative value of Mr. Richardson's testimony – opining that Mr. O'Steen violated the ethics rules – was substantially outweighed by its unfair prejudice and its tendency to confuse and mislead the jury. The district court thus abused its discretion in admitting the testimony.

Under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury." A matter's "probative value" is measured by its "tendency to make a fact" that is "of consequence in determining the action" "more or less probable than it would be without the evidence." Fed. R. Evid. 401. "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee notes. "Evidence is 'unfairly prejudicial if it appeals to the jury's sympathies, . . . *provokes its instinct to punish*, or otherwise may cause a jury to base its decision on something other than the established propositions in the case.'" *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) (Ripple, J.) (emphasis added).

Mr. Richardson's testimony, at a minimum, provoked the jury's "instinct to

punish" rather than focus the jury's decision on whether Mr. O'Steen was guilty of the criminal charges in this case. Stated another way, Mr. Richardson's testimony gave rise to the risk that the jury would improperly convict Mr. O'Steen based on evidence of his violation of The Florida Bar's ethics rules rather than the crimes charged in the indictment.

There was little or no probative value to Mr. Richardson's opinion that Mr. O'Steen had violated governing ethics principles. Mr. Richardson's testimony was not relevant to establish any of the elements of Count Three.

Mr. Richardson's testimony served only to improperly lead the jury to conclude that Mr. O'Steen was an unethical lawyer. As the First Circuit has recognized in a similar context:

> [A]n overemphasis on what state law forbids may lead the jury to believe that state rather than federal law defines the crime. . . . Wire and mail fraud are *federal* offenses; and while state violations may play a role, the jury should not be allowed to slip into the misunderstanding that any violation of proliferating state laws and regulations controlling this area automatically amounts to a federal crime.
> . . . The district court has ample authority under Federal Rule of Evidence 403 to limit evidence concerning state law requirements where that evidence is substantially more prejudicial than probative.

*United States v. Sawyer*, 85 F.3d 713, 731-32 (1st Cir. 1996) (emphasis in original).

The admission of Mr. O'Steen's ethics violations through an expert witness was particularly harmful, as expert testimony poses an even greater risk of prejudice.

As explained by the Supreme Court:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

Perhaps Mr. Richardson's testimony could have been admissible as rebuttal testimony – *if* Mr. O'Steen (or some other witness) had testified that his actions complied with the ethics rules. Perhaps Mr. Richardson's testimony could have been admissible *if* he explained *only* the ethics rules – *without opining that Mr. O'Steen violated those ethics rules*. Such limited testimony would have alleviated the Government's concern that the jury might assume that contingency fee contracts are permissible in criminal cases. (Doc 118, at 16) ("[J]urors may assume . . . from watching . . . .plaintiffs' lawyers' commercials on TV: You don't get paid till I get paid."). But allowing Mr, Richardson to opine that Mr. O'Steen violated the ethics rules was a step too far.

A Third Circuit case cited by the Government illustrates this point. (Doc 118, at 18) (citing *United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011)). In *Fumo*, the government prosecuted a former state senator on charges of fraud, tax evasion, and obstruction of justice. 655 F.3d at 294. Though the Third Circuit affirmed the

admission of expert ethics testimony, it did so only after it noted the expert "appropriately" never testified whether the defendant, in fact, had violated the ethics rules:

> Appropriately, Contino [the expert] never testified as to whether Fumo [the defendant] himself had violated the Ethics Act, or whether he was guilty of any of the crimes with which he was charged.

*Fumo*, 655 F.3d at 303.

By contrast, here, Mr. Richardson told the jury that "[m]y opinion is that two rules of professional conduct were violated." (Doc 246, at 49). The admission of this testimony was an abuse of discretion.

### d. The limiting instruction did not cure the district court's error in admitting Mr. Richardson's testimony

During the trial, the district court gave the following limiting instruction:

> Ladies and gentlemen, you have heard some evidence that the defendant may have violated certain rules of the Florida Bar regulating the ethical practice of law, and you may hear more discussion about that. I instruct you that you may consider this evidence in deciding whether the defendant is guilty of any crime charged in the indictment; however, it is very important that you remember that violating Florida Bar regulations or Florida Bar ethical rules does not constitute a criminal offense. And you may not convict the defendant of any crime solely because you find or believe that he has violated regulations or rules of ethics.

(Doc 246, at 68). The court repeated a nearly identical instruction before closing arguments. (Docs 159, at 14; 247, at 44). These instructions, however, did not cure

the prejudice to Mr. O'Steen.

The Supreme Court has recognized that there are situations where even the best jury instructions cannot cure defects at trial:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

*Bruton v. United States*, 391 U.S. 123, 135 (1968); *accord United States v. Doherty*, 233 F.3d 1275, 1282 (11th Cir. 2000) (same). As Justice Robert Jackson explained, "the naive assumption that prejudicial effects can be overcome by instructions to the jury, . . . lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring).

The normal presumption that the jury will follow an instruction to disregard inadmissible evidence does not apply when "there is [1] an "overwhelming probability that the jury will be unable to follow the court's instructions . . . and [2] a strong likelihood that the effect of the evidence would be "*devastatin*g" to the defendant. *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (emphasis added). The exception to the general rule applies in this case.

There is an "overwhelming probability" that the jury was unable to follow the district court's limiting instruction, and a strong likelihood that the effect of Mr.

Richardson's testimony was "devastating" to Mr. O'Steen. After hearing numerous Government witnesses over the course of several days, the jury was told at the conclusion of the Government's case-in-chief that Mr. O'Steen had violated The Florida Bar's ethics rules. (Doc 246, at 49-50, 64). In this setting, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135. There exists here "an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence will be 'devastating' to the defendant." *Greer*, 483 U.S. at 766 n.8.

Mr. Richardson's opinion that Mr. O'Steen had violated the ethics rules was not relevant for any proper purpose. But even it was relevant for some proper purpose, the jury could not be expected to compartmentalize the evidence and consider it only for that purpose. *See United States v. Sampson*, 980 F.2d 883, 889 (3d Cir. 1992) ("This instruction does not cure the error. Where the government has not clearly articulated reasons why the evidence is relevant to any legitimate purpose, there is no realistic basis to believe that the jury will cull the proper inferences and material facts from the evidence."). No juror could disregard Mr. Richardson's opinion that Mr. O'Steen's actions were "unethical" and violated The Florida Bar's rules. (*See* Doc 246, at 49:22-23, 119:13-15).

e. <u>The admission of Mr. Richardson's testimony was harmful error</u>

The Government bears the burden of establishing that an error is harmless. *United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010). "Reversal is warranted only if the error resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (internal alterations and quotations omitted). For all the reasons argued above, the admission of Mr. Richardson's testimony resulted in actual prejudice that had a substantial and injurious effect or influence on the jury's verdict.

As the Supreme Court has explained, courts "almost unanimously . . . disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt." *Michelson v. United States*, 335 U.S. 469, 475 (1948). The prosecution "may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime." *Id.* While such evidence may be relevant, it "weigh[s] too much with the jury and . . . overpersuade[s] them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Id.* at 476. "The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." *Id.*

In this case, Mr. Richardson's opinion that Mr. O'Steen violated The Florida Bar's ethics rules denied Mr. O'Steen a fair opportunity to defend himself against the Government's charges. *See id.* The admission of this opinion testimony was harmful error. *See, e.g., United States v. Rodriguez Cortes*, 949 F.2d 532, 541, 543 (1st Cir. 1991) ("We will not disturb [evidentiary] rulings absent an abuse of discretion. We will, nevertheless, reverse a lower court's determination in 'exceptional circumstances.' We find that such exceptional circumstances exist in this case. . . . For non-constitutional evidentiary errors under Federal Rule of Evidence 403 this court will find an error is harmless if we determine that it is highly probable that the error did not contribute to the verdict. Here it is far too likely that the error affected Ocampo Hoyos' substantial rights. It was a very close case; it would have taken very little to tilt the balance.") (citations omitted).

******

In sum, the district court abused its discretion and reversibly erred by allowing Mr. Richardson to opine that Mr. O'Steen violated The Florida Bar's ethics rules. The probative value of Mr. Richardson's testimony was substantially outweighed by its unfair prejudice and other dangers. The district court's limiting instruction did not cure the error. Instead, that error harmed Mr. O'Steen and deprived him of a fair trial. His convictions and sentence should be reversed, and this case should be remanded for a new trial.

**3.    The district court should have granted a judgment of acquittal on Count Four (untimely filing of Form 8300).**

Count Four alleged that Mr. O'Steen "received more than $10,000 in currency," and that he "did *willfully* fail to file . . . Form 8300 . . . *within fifteen days after the currency is received, as prescribed by the applicable regulations*." (Doc 1, at 15) (emphasis added).   The Government's evidence was insufficient to prove beyond a reasonable doubt that Mr. O'Steen *willfully* failed to *timely* file a Form 8300.   Thus, the district court should have granted Mr. O'Steen's motion for judgment of acquittal on Count Four.  (Doc 246, at 282); Fed. R. Crim. P. 29(a).

a.    The statutory and regulatory text, and the precedent construing the word "willfully" in the statute

The indictment listed two statutes and a regulation that Mr. O'Steen allegedly violated – 31 U.S.C. §§ 5322, 5331; 31 C.F.R. § 1010.330(a).  Section 5331 provides that "[a]ny person . . . who . . . receives more than $10,000 in coins or currency . . . shall file a report . . . with respect to such transaction . . . *at such time . . . as the Secretary may, by regulation, prescribe*."  31 U.S.C. § 5331(a) (emphasis added). The Treasury Secretary's regulation provides that a recipient must report an a "initial payment exceed[ing] $10,000 . . . *within 15 days of its receipt*."  31 C.F.R. § 1010.330(b)(1) (emphasis added); *see also id*. § 1010.330(b)(3) ("The report must be made within 15 days after receiving the payment in excess of $10,000 . . . .").  Section

5322 provides criminal penalties for "[a] person [who] *willfully* violat[es] this subchapter [including 31 U.S.C. § 5331] or a regulation prescribed . . . under this subchapter [including 31 C.F.R. § 1010.330]." 31 U.S.C. § 5322 (a) (emphasis added).

In *United States v. Granda*, 565 F. 2d 922 (5th Cir. 1978), this Court addressed two reporting statutes (then codified at 31 U.S.C. §§ 1058, 1101) that, textually, were materially the same as, and the predecessors to, the two statutes at issue here (31 U.S.C. §§ 5322, 5331). This Court held that "the terms knowing and willful require proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime." *Granda*, 565 F. 2d at 925-26. The Court reversed a conviction in part because a "proper [jury] instruction would include some discussion of the defendant's ignorance of the law since the defendant's alleged ignorance of the reporting requirements goes to the heart of his or her denial of the specific intent necessary to commit the crime." *Id.* at 926; *see also United States v. Rigdon*, 874 F.2d 774, 778 (11th Cir. 1989) (a defendant is criminally liable for failing to report a currency transaction only if "he had specific knowledge of the statute *and its implementing regulations*" and that "[i]gnorance of the reporting requirement constitutes a valid defense.") (emphasis added).

*Granda*'s construction of "willfully" in § 5322 – requiring the Government to prove a defendant knew his conduct was unlawful – was later confirmed by the

Supreme Court. *See Ratzlaf v. United States*, 510 U.S. 135 (1994). Approving of *Granda* and other decisions, the Supreme Court found it "significant that § 5322(a)'s omnibus 'willfulness' requirement, when applied to other provisions in the same subchapter, consistently has been read by the Courts of Appeals to require both 'knowledge of the reporting requirement' *and* a 'specific intent to commit the crime,' i.e., 'a purpose to disobey the law.'" *Id.* at 141. These decisions, the Court observed, "describe a 'willful' actor as one who violates 'a known legal duty.'" *Id.*

Accordingly, the Supreme Court in *Ratzlaf* held that where, as here, § 5322(a) provides the *mens rea* for another substantive offense – such as 31 C.F.R. § 1010.330's 15-day requirement – then ignorance of the law was a defense:

> We do not dishonor the venerable principle that ignorance of the law generally is no defense to a criminal charge. In particular contexts, however, Congress may decree otherwise. That, we hold, is what Congress has done with respect to 31 U.S.C. § 5322(a) and the provisions it controls.

*Id.* at 149 (internal citations omitted). "To convict Ratzlaf of the crime with which he was charged, violation of 31 U.S.C. §§ 5322(a) and 5324(3), the jury had to find he knew the structuring in which he engaged was unlawful." *Id.* at 142.

Likewise, here, to convict Mr. O'Steen of the crime with which he was charged, violation of 31 U.S.C. §§ 5322(a), 5331 and 31 C.F.R. § 1010.330, the jury had to find – and the Government had to prove – that Mr. O'Steen knew it was

unlawful to fail to file Form 8300 within fifteen days after the currency was received. On this record, the evidence was insufficient for the jury to make such a finding, and thus the district court should have entered a judgment of acquittal.

b. _The evidence was insufficient to prove beyond a reasonable doubt that Mr. O'Steen willfully failed to file a report within fifteen days of when he received the currency_

The Government's evidence that could plausibly support a conviction on Count Four is summarized _infra_ at 10-12. That evidence, admittedly, was sufficient to prove that Mr. O'Steen knew it was unlawful to _fail to file_ a Form 8300 to report his receipt of $60,0000. But that is not the offense the Government charged in Count Four. And for good reason. As Agent Castiglia testified, Mr. O'Steen on May 14, 2019, in fact, filed the Form 8300 (albeit untimely) and reported the $60,000 in cash he had received. (Docs 246, at 157-59, 190-91; 157-78).

Perhaps because Mr. O'Steen _had filed_ the Form 8300, the Government instead chose to charge Mr. O'Steen with a different offense – "_willfully_ fail[ing] to file . . . [a] Form 8300 . . . _within fifteen days after the currency [was] received, as prescribed by the applicable regulations_." (Doc 1, at 15). The Government, of course, must prove the offense charged in the indictment, not some other offense. _Cf. United States v. Toler_, 144 F.3d 1423, 1426 (11th Cir. 1998) ("[T]he government must prove the conspiracy it charged in the indictment rather than some other conspiracy."). The Government did not prove beyond a reasonable doubt that Mr. O'Steen committed

the offense charged in Count Four.

Specifically, it did not prove that Mr. O'Steen *knew* that it was unlawful to fail to file Form 8300 *within fifteen days after the currency was received*. The Government presented essentially three buckets of evidence in its failed attempt to prove Count Four.

First, the Government presented evidence – through Agent Castiglia's testimony – that Mr. O'Steen, as a lawyer, had access to information about the legal requirements for reporting cash transactions. But this general knowledge – like that contained in the 30-second online clip – did not prove beyond a reasonable doubt that Mr. O'Steen knew of the 15-day deadline in the Treasury regulation.

Second, the Government presented evidence – through the testimony of the bank teller, Ms. Garner – that Mr. O'Steen knew of the requirements stated in the CTR pamphlet. But the CTR pamphlet said nothing about the 15-day requirement. (Doc 157-74 (Gov't. Ex. 104)).

Third, the Government relied on the Form 8300 itself. Buried in three pages of instructions, one can find 17 words about the 15-day requirement. (Doc 157-95, at 3-5). But the Government presented no evidence that Mr. O'Steen had read, or even skimmed, the form's instructions at any time before his May 2019 filing of the form. This evidence is insufficient to prove beyond a reasonable doubt that Mr.

O'Steen knew of the 15-day requirement.

Accordingly, the district court erred in denying a judgment of acquittal on Count Four.

**4.** **The district court reversibly erred by improperly instructing the jury on the *mens rea* to convict under Count Four (untimely filing of Form 8300).**

a.     The district court's instruction and the parties' arguments

The parties proposed jury instructions for Count Four. (Docs 125, at 19; 126, at 38-39; 147, at 2; 148, at 38-39). The district court then proposed its own instruction. (Doc 159, at 39-40).

The court's instruction referred four times to the *mens rea* to convict Mr. O'Steen on Count Four. (Docs 160, at 34-35; 247, at 58-59). First, the opening paragraph stated: "It is a federal crime . . . for anyone to *knowingly* evade a currency-transaction reporting requirement." (Doc 160, at 34) (emphasis added). Then, after reciting the statutory and regulatory text, the instruction mentioned the *mens rea* three additional times when stating the elements that the Government had to prove, but it failed to mention the *mens rea* in element 3 – which stated the 15-day requirement:

> (2) . . . the Defendant *knowingly* received more than $10,000 in currency in one transaction;
>
> (3) . . . the Defendant failed to file a Form 8300 . . . within 15 days after receiving the currency; and
>
> (4) . . . the Defendant acted *willfully*, that is, he had *knowledge of the currency transaction reporting requirements* and failed to file a Form 8300 for the purpose of evading those reporting requirements.

(Doc 160, at 34-35) (emphasis added).

Mr. O'Steen's counsel objected that the court's instruction was "a little vague as to what the willfulness applies." (Doc 247, at 26). Counsel requested the following addition to the fourth element, as indicated by italics:

> (4) that the Defendant acted willfully, that is, he had knowledge of the currency transaction reporting requirements, *including knowledge that the form was required to be filed within 15 days after receipt of the money*, and failed to file a Form 8300 for the purpose of evading those reporting requirements.

(Doc 247, at 26). Alternatively, counsel requested that the court "include the willfulness in element 3 and then have element 4 be . . . a definition of willfulness, that he acted with knowledge of the requirements and failed to do it." (Doc 247, at 27).

Mr. O'Steen's counsel argued that the "gravamen" of Count Four was the "untimely filing." (Doc 8, at 26). The Government disagreed. It argued that "[t]he 15 days is irrelevant to the will or the intent behind the offense" and that "the substance of the reporting requirements is not that it happens within 15 days, it's that $10,000 or more in cash gets reported to the federal government." (Doc 247, at 27). It further argued that element 3's statement on the 15-day requirement – lacking any mention of willfulness or knowledge in that element – was "perfectly adequate." (Doc 247, at 27).

Mr. O'Steen's counsel replied that the case was "all about the alleged willful failure to not file within 15 days." (Doc 247, at 27-28). The district court then

interjected:

> [T]he jury could conclude that [Mr. O'Steen] was trying to evade the currency transaction requirement for that period of time until he filed it after he knew of the investigation. I don't know that it . . . necessarily rises and falls just based on . . . the 15-day time frame. It's the question of whether they believed that . . . for that [however-many-month] period was he attempting to evade the requirement.

(Doc 247, at 28).

Mr. O'Steen's counsel responded: "Count Four doesn't charge an attempt to evade the reporting requirement." (Doc 247, at 29). After reading out loud Count Four as charged, counsel argued: "That is the crime that the government chose to charge Mr. O'Steen with, and that's the crime that they must prove. And the willfulness, therefore, is the willfulness to file within 15 days. And the instruction needs to make that clear." (Doc 247, at 29).

The court overruled the objection, reasoning the instruction was "sufficient":

> [I]t sets out what the reporting requirements are and it tells the jury that for them to find that the defendant acted willfully, he has to have had knowledge of those currency reporting requirements. . . . I [don't] need to emphasize the specific one again. It's already . . . discussed both on page 39 and it's in the third element of the offense. . . . [I]t's [not] necessary or appropriate to add it again in element 4.

(Doc 247, at 30-31).

In fact, however, the court never told the jury that the 15-day deadline was a "reporting requirement." (*See* Doc. 160, at 34-35). The jury was left to speculate what were, and were not, the "reporting requirements."

### b.    The district court's instruction was confusing and misleading

To convict on Count Four, the Government had to prove that Mr. O'Steen knew of the regulation's 15-day requirement. *See Ratzlaf*, 510 U.S at 149. The district court thus reversibly erred by failing to clearly instruct that the jury had to find that Mr. O'Steen knew of the 15-day requirement. *Cf. Granda*, 565 F.2d at 925-26 (reversing because of a deficient jury instruction and noting "the terms knowing and willful require proof of the defendant's knowledge of the reporting requirement").

"[T]his [C]ourt must ensure that the [district court's] instructions show no tendency to confuse or to mislead the jury with respect to the applicable principles of law." *Gulf Life Ins. Co. v. Folsom*, 907 F.2d 1115, 1121 (11th Cir. 1990) (internal quotations omitted). Here, the district court's instructions confused and misled the jury because they did not clearly state that the 15-day deadline was a "reporting requirement" for which a willfulness finding was required. Had the district court accepted the first request by Mr. O'Steen's counsel – inserting in element 4 the words "including knowledge that the form was required to be filed within 15 days after receipt of the money" – the jury would not have been confused or misled.

Even worse, the district court expressly instructed that a finding of knowledge or willfulness was required for elements 2 and 4, but then omitted similar express

language in element 3, which was sandwiched between elements 2 and 4. An ordinary juror would naturally read such an omission in element 3 – when read next to the words "knowingly," "willfully," and "knowledge" in elements 2 and 4 – as meaning that the Government was not required to prove knowledge or willfulness for element 3. *Cf. Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 937 (11th Cir. 2023) (Jordan, J., concurring) (reading two adjacent statutory provisions as having different meanings because the former provision omitted a modifier contained in the latter provision).

Indeed, that reading of the instruction – as not requiring proof that Mr. O'Steen knew about the 15-day requirement – is precisely how the Government's attorney read the district court's instruction. (Doc 247, at 27) ("The 15 days is irrelevant to the will or the intent behind the offense."). But that reading is contrary to the caselaw discussed above, which does require a finding that the defendant knew of the 15-day requirement. *See, e.g., Ratzlaf*, 510 U.S. at 149. Had the district court accepted the secondary request by Mr. O'Steen's counsel – inserting the word "willfully" in element 3 – the jury would not have been confused or misled.

Because the district court's instruction on Count Four was confusing and misleading, this Court should reverse and remand for a new trial on Count Four.

**5. Mr. O'Steen could not be constitutionally convicted of Count Four because the regulation underlying that count was not adopted by the legislative process mandated by Article I.**[9]

The Constitution "vest[s] the power to prescribe rules limiting their liberties in *Congress alone*." *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J. dissenting) (emphasis added).[10]  Mr. O'Steen, however, has been convicted of violating a *regulation* – a law adopted by the Treasury Secretary, not Congress.  The law is thus unconstitutional.  Accordingly, this Court should reverse the conviction on Count Four.

_____

[9] This argument was preserved.  (Doc 246, at 283-84).

[10] *Gundy* garnered no majority opinion.

## K.  CONCLUSION

For Issues 1 and 2 (concerning Count Three), the Court should vacate the conviction and remand for a new trial.  For Issues 3, 4, and 5 (concerning Count Four), the Court should vacate the conviction and instruct on remand that the district court either: (i) enter a judgment of acquittal or dismissal (Issues 3 and 5), or (ii) conduct a new trial (Issue 4).

## L.  CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certify pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) that this brief complies with the type-volume limitation.  The number of words in this brief is 12,825.

## M. CERTIFICATE OF SERVICE

I HEREBY CERTIFY a true and correct copy of the foregoing instrument has

been furnished to:

Assistant United States Attorney Holly L. Gershow

by U.S. mail delivery this 29th day of March, 2023.

Respectfully submitted,

/s/ Michael Ufferman             /s/ Bryan S. Gowdy

MICHAEL UFFERMAN

MICHAEL UFFERMAN LAW FIRM, P.A.

2022-1 Raymond Diehl Road

Tallahassee, Florida 32308

(850) 386-2345

FL Bar No. 114227

ufferman@uffermanlaw.com

BRYAN S. GOWDY

CREED & GOWDY, P.A.

865 May Street

Jacksonville, Florida 32204

(904) 350-0075

FL Bar No. 176631

bgowdy@appellate-firm.com

filings@appellate-firm.com

Counsel for Appellant **O'STEEN**