No. 22-13569-JJ

In the
**United States Court of Appeals
for the Eleventh Circuit**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MARION MICHAEL O'STEEN,
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 3:21-CR-16-MMH-JBT

## BRIEF OF THE UNITED STATES

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

HOLLY L. GERSHOW
Assistant United States Attorney
Deputy Chief, Appellate Division
Florida Bar No. 98960
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

May 30, 2023

**Certificate of Interested Persons
and Corporate Disclosure Statement**

The Certificate of Interested Persons and Corporate Disclosure

Statement in Marion Michael O'Steen's principal brief is complete.

No publicly traded company or corporation has an interest in the

outcome of this appeal.

## Statement Regarding Oral Argument

The United States does not request oral argument.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement......... C-1

Statement Regarding Oral Argument ................................................................. i

Table of Contents ............................................................................................ ii

Table of Citations ........................................................................................... v

Statement of Jurisdiction .............................................................................. xi

Statement of the Issues ................................................................................. 1

Statement of the Case ................................................................................... 2

    *Course of Proceedings* ................................................................................ 2

    *Statement of the Facts* ............................................................................... 5

    I.    O'Steen's Offenses ............................................................................ 5

        A.    O'Steen demands $60,000 from his client to cash in a favor with the State Attorney to get the client pretrial diversion. ...................................................................... 5

        B.    O'Steen fails to report Tong's cash payments until after he finds out that the FBI is investigating him, over eight months after he had received the cash. ............. 10

    II.    O'Steen's Trial ................................................................................ 12

        A.    The district court allows expert testimony about the impropriety of O'Steen's $60,000 fee under the Florida Rules of Professional Conduct but gives a limiting instruction after that testimony and again before jury deliberations. ................................................................. 12

B.    The court discusses the jury instructions with the parties and O'Steen agrees to most of the court's proposed instructions—including the extortion instruction. ..................................................... 13

*Standards of Review* ................................................................. 16

Summary of the Argument ........................................................ 17

Argument and Citations of Authority ....................................... 21

I.    The district court did not abuse its discretion by allowing the United States' expert to testify that O'Steen had violated the Florida Bar's rules and ethical regulations while giving a limiting instruction about how the jury could use this testimony.................................................................... 21

II.    The invited-error doctrine bars O'Steen's challenges to the jury instruction on count three (Hobbs Act extortion) because he agreed to that instruction, and, even if it does not, O'Steen has not established his right to relief under plain-error review.................................................................... 27

A.    The invited-error doctrine bars O'Steen's challenges because he agreed to the extortion jury instruction he now challenges. ........................................................... 27

B.    But if this Court reviews O'Steen's newly raised challenge, it should conclude that O'Steen has not established his right to relief under plain-error review. ...... 29

(1)    *O'Steen has not shown that the jury instruction's inclusion of extortion by force or violence plainly constructively amended the indictment* ............................ 30

(2) *O'Steen has not shown that the district court plainly erred in instructing the jury on extortion under color of official right or that the purported error affected his substantial rights.* ...........................................................34

III.  The district court did not abuse its discretion in wording the jury instruction on count four (willfully failing to timely report a cash transaction over $10,000)......................................43

IV.  Viewing the evidence in the light most favorable to the verdict, the district court properly denied O'Steen's motion for judgment of acquittal on count four because the evidence showed that O'Steen knew of the reporting requirements for cash transactions over $10,000. ..................................................46

V.  Congress did not unconstitutionally delegate its legislative authority in 31 U.S.C. § 5331 by requiring the reporting of the receipt of over $10,000 in cash but leaving the details of the form and timing of that report to the Secretary of the Treasury. ..................................................................................48

Conclusion..................................................................................................52

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

iv

# Table of Citations

**Cases**

*Bruton v. United States,*
391 U.S. 123 (1968) .................................................................25, 26

*Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.,*
945 F.3d 1150 (11th Cir. 2019) ................................................ 23

*Greer v. United States,*
141 S. Ct. 2090 (2021) .............................................................. 29

*\*Gundy v. United States,*
139 S. Ct. 2116 (2019) ................................................ 48–50, 52

*Jones v. United States,*
527 U.S. 373 (1999) .................................................................. 30

*Old Chief v. United States,*
519 U.S. 172 (1997) ..............................................................22, 24

*Ratzlaf v. United States,*
510 U.S. 135 (1994) ..............................................................44–46

*Richardson v. Marsh,*
481 U.S. 200 (1987) .................................................................. 25

*Stirone v. United States,*
361 U.S. 212, (1960) ................................................................. 31

*Touby v. United States,*
500 U.S. 160 (1991) ..............................................................48–49

*United States v. Almanzar,*
634 F.3d 1214 (11th Cir. 2011) ................................................ 25

*United States v. Ambert,*
561 F.3d 1202 (11th Cir. 2009) ...........................................17, 51

*United States v. Bane,*
948 F.3d 1290 (11th Cir. 2020) ................................................ 49

*United States v. Benitez*,
    732 F. App'x 783 (11th Cir. 2018) ........................................................... 33

*United States v. Brito*,
    721 F.2d 743 (11th Cir. 1983) ................................................................. 36

*United States v. Brown*,
    342 F.3d 1245 (11th Cir. 2003) ............................................................. 50

*United States v. Brown*,
    441 F.3d 1330 (11th Cir. 2006) ............................................................. 16

*United States v. Brown*,
    665 F.3d 1239 (11th Cir. 2011) ........................................................24–25

*United States v. Browne*,
    505 F.3d 1229 (11th Cir. 2007) ............................................................. 37

*\*United States v. Burnette*,
    65 F.4th 591 (11th Cir. 2023) ........................................ 16, 28, 30, 38

*United States v. Carter*,
    776 F.3d 1309 (11th Cir. 2015) ............................................................. 29

*United States v. Colston*,
    4 F.4th 1179 (11th Cir. 2021) ............................................................... 34

*\*United States v. Crabtree*,
    878 F.3d 1274 (11th Cir. 2018) ........................................................26–27

*United States v. Enmons*,
    410 U.S. 396 (1973) ............................................................................... 23

*\*United States v. Feldman*,
    931 F.3d 1245 (11th Cir. 2019) ........................................................28, 29

*United States v. Fortenberry*,
    971 F.2d 717 (11th Cir. 1992) ............................................................... 22

*United States v. Frank*,
    599 F.3d 1221 (11th Cir. 2010) ............................................................. 28

vi

*United States v. Gaines*,
690 F.2d 849 (11th Cir. 1982) ................................................... 43

*United States v. Garcia*,
405 F.3d 1260 (11th Cir. 2005) ................................................. 17

*United States v. Gonzalez*,
834 F.3d 1206 (11th Cir. 2016) ............................................29, 39

*United States v. Grimsley*,
808 F. App'x 865 (11th Cir. 2020) ............................................ 37

*United States v. Harris*,
916 F.3d 948 (11th Cir. 2019) ................................ 31, 32, 40, 41

*United States v. Iriele*,
977 F.3d 1155 (11th Cir. 2020) ................................................. 47

*United States v. Kattan-Kassin*,
696 F.2d 893 (11th Cir. 1983) ................................................... 51

*United States v. Knowles*,
889 F.3d 1251 (11th Cir. 2018) ................................................. 16

*United States v. Maitre*,
898 F.3d 1151 (11th Cir. 2018) ...........................................17, 43

*United States v. Marti*,
294 F. App'x 439 (11th Cir. 2008) ............................................ 27

*United States v. Monroe*,
353 F.3d 1346 (11th Cir. 2003) ................................................. 38

*United States v. Narog*,
372 F.3d 1243 (11th Cir. 2004) ...........................................33, 34

*United States v. Nunez*,
1 F.4th 976 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 2675 (2022) .............. 34

*United States v. Osorto*,
995 F.3d 801 (11th Cir.), *cert. denied*, 142 S. Ct. 470 (2021) ....................... 42

*United States v. Pelisamen,*
   641 F.3d 399 (9th Cir. 2011) ............................................... 39

*United States v. Pendergraft,*
   297 F.3d 1198 (11th Cir. 2002).......................................... 23

*United States v. Pineiro,*
   389 F.3d 1359 (11th Cir. 2004)........................................... 17

*United States v. Rodriguez,*
   398 F.3d 1291 (11th Cir. 2005)........................................... 38

*United States v. Rosenthal,*
   805 F.3d 523 (5th Cir. 2015) .............................................. 36

*United States v. Ross,*
   131 F.3d 970 (11th Cir. 1997)........................................27–28

*United States v. Ruan,*
   56 F.4th 1291 (11th Cir. 2023)........................................... 35

*\*United States v. Sammour,*
   816 F.3d 1328 (11th Cir. 2016)...................................... *passim*

*\*United States v. Sans,*
   731 F.2d 1521 (11th Cir. 1984)......................................48, 50

*United States v. Smith,*
   685 F.2d 1293 (11th Cir. 1982).......................................... 24

*United States v. Sunmonu,*
   859 F. App'x 431 (11th Cir. 2021) ..................................... 24

*United States v. Terzado-Madruga,*
   897 F.2d 1099 (11th Cir. 1990).......................................... 22

*United States v. Tomblin,*
   46 F.3d 1369 (5th Cir. 1995) ............................................. 37

*United States v. Vigil,*
   523 F.3d 1258 (10th Cir. 2008).......................................... 40

*Wayman v. Southard,*
   23 U.S. 1 (1825)..................................................51

*Whitman v. Am. Trucking Ass'n,*
   531 U.S. 457 (2001) ...........................................48

*Yakus v. United States,*
   321 U.S. 414 (1944) ...........................................49

**Statutes**

18 U.S.C. § 371 ......................................................3

18 U.S.C. § 1951 ..................................................31

18 U.S.C. § 1951(a) .........................................3, 31

18 U.S.C. § 3231 ..................................................xi

28 U.S.C. § 1291 ..................................................xi

31 U.S.C. § 5322 ..............................................3, 44

31 U.S.C. § 5322(a) ...........................................49

31 U.S.C. § 5331 ...................................... *passim*

**Rules**

11th Cir. R. 28-5......................................................2

Fed. R. App. P. 4(b) ..............................................xi

Fed. R. Crim. P. 29 ..............................................4

Fed. R. Crim. P. 33 ..............................................4

Fed. R. Evid. 401 ................................................21

Fed. R. Evid. 403 ...................................16, 21, 22

**Other Authorities**

31 C.F.R. § 1010.330(b)(1)..................................44

H.R. No. 975, 91st Cong., 2d Sess. .............................................. 51

Cass R. Sunstein & Adrian Vermeule, *Libertarian Administrative Law*,
   82 U. Chi. L. Rev. 393 (2015) .................................................... 49

U.S. Const. art. I, § 1 ................................................................... 48

U.S. Const. amend. V .................................................................. 30

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Middle District of Florida in a criminal case. That court had jurisdiction. *See* 18 U.S.C. § 3231. The court entered judgment against Marion Michael O'Steen on October 18, 2022, Doc. 215, and O'Steen timely filed a notice of appeal the next day, Doc. 218. *See* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal. *See* 28 U.S.C. § 1291.

# Statement of the Issues

I.      Did the district court abuse its discretion by allowing the United States' expert to testify that O'Steen had violated the Florida Bar's rules and ethical regulations while also giving a limiting instruction about how the jury could use that testimony? (O'Steen's Issue 2)

II.     Does the invited-error doctrine bar O'Steen's challenges to the jury instruction on count three (Hobbs Act extortion) because he agreed to that instruction, and, if not, has O'Steen established his right to relief under plain-error review? (O'Steen's Issue 1)

III.     Did the district court abuse its discretion in how it worded the jury instruction for count four (willfully failing to report a cash transaction)? (O'Steen's Issue 4)

IV.     Viewing the evidence in the light most favorable to the verdict, did the district court properly deny O'Steen's motion for judgment of acquittal on count four because the evidence showed that he knew of the reporting requirements for cash transactions over $10,000? (O'Steen's Issue 3)

V.     Did Congress unconstitutionally delegate its legislative authority in 31 U.S.C. § 5331 by requiring the reporting of the receipt of over $10,000 in cash but leaving the details of the form and timing of that report to the Secretary of the Treasury? (O'Steen's Issue 5)

# Statement of the Case[1]

Marion Michael O'Steen, a criminal defense attorney, knew that his client Andy Tong feared being convicted of operating an illegal gambling business. Capitalizing on Tong's fear, O'Steen presented Tong with two choices: (1) pay $60,000 (on top of the fee he'd already paid) and O'Steen would cash in a favor with Jeffrey Siegmeister, the State Attorney, to make Tong's criminal charge go away; or (2) go to trial and likely lose. Tong chose the former, paying O'Steen in two $30,000 cash installments. But O'Steen did not report receiving those payments within 15 days, as required. Rather, he waited over eight months, only filing the required reports after learning that the FBI was investigating him. In this direct criminal appeal, O'Steen challenges his convictions for Hobbs Act extortion and for violating a reporting requirement of the Bank Secrecy Act.

## *Course of Proceedings*

A grand jury returned an indictment charging O'Steen and Siegmeister with various offenses, including bribery and extortion offenses, arising from deals that O'Steen had sought for his clients in exchange for payments to State

---

[1]We cite the transcripts based on "the page number that appears in the header generated by the district court's electronic filing system." 11th Cir. R. 28-5. We cite all other documents using the documents' own page numbers.

Attorney Siegmeister. Doc. 1. The indictment charged O'Steen with having

conspired to use a facility of interstate commerce for unlawful activity, in

violation of 18 U.S.C. § 371 (count one); having conspired to interfere with

commerce by extortion, in violation of 18 U.S.C. § 1951(a) (count two); having

interfered with commerce by extortion, in violation of 18 U.S.C. § 1951(a)

(count three); and having failed to report a cash transaction of over $10,000

within 15 days of that transaction, in violation of 31 U.S.C. §§ 5331 and 5322

(count four). Doc. 1. Siegmeister agreed to plead guilty to certain charges and

cooperate with the United States. Doc. 79. O'Steen, on the other hand,

pleaded not guilty and proceeded to trial.

Before trial, O'Steen moved in limine to exclude evidence "relating to

any perceived ethical violations of the Rules Regulating the Florida Bar,"

arguing that such evidence would unfairly prejudice him. Doc. 93 at 1–3. The

United States responded, Doc. 99, and, after conducting a hearing, the district

court denied O'Steen's motion, Doc. 118 at 35. The court determined that the

evidence was relevant to whether the $60,000 that O'Steen received from Tong

was extorted, but the court said that it would consider giving a limiting

instruction and requested that O'Steen submit a proposed instruction before

trial. *Id*.

As requested, O'Steen submitted a proposed limiting instruction. Doc.

125 at 4. He also submitted proposed jury instructions for the charged offenses, *id*. at 8–19, as did the United States, Docs. 126, 148. The court then created its own proposed instructions, Doc. 159, which it reviewed with the parties during trial, as discussed below. Doc. 247 at 7–33.

At the end of the United States' case-in-chief, O'Steen moved for a judgment of acquittal under Fed. R. Crim. P. 29, and the court took that motion under advisement until the end of trial. Doc. 246 at 195, 275–296. The jury found O'Steen not guilty on counts one and two, but it found him guilty on counts three and four. Doc. 162. On count three, the jury unanimously found O'Steen guilty of both extortion and extortion under color of official right. *Id*. The court then denied O'Steen's motion for judgment of acquittal on counts three and four. Doc. 172.

O'Steen filed a motion for a new trial under Fed. R. Crim. P. 33. Doc. 178. The United States opposed that motion, Doc. 181, and the court denied it, Doc. 187. The court then sentenced O'Steen to serve concurrent guidelines-range sentences of 44 months on both counts. Docs. 215, 216.

## Statement of the Facts

### I.    O'Steen's Offenses

#### A.    O'Steen demands $60,000 from his client to cash in a favor with the State Attorney to get the client pretrial diversion.

In 2011, Siegmeister decided to run for State Attorney for the Third Judicial Circuit. Doc. 240 at 47. O'Steen, a criminal defense attorney in Dixie County, pledged his support in return for Siegmeister's agreeing to have an open door to him. *Id.* at 54–55. O'Steen made good on his pledge of support, going with Siegmeister to events and introducing him to community leaders. Doc. 240 at 55–59. He also paid for a billboard that Siegmeister used. *Id.* at 56. O'Steen was the only person who bundled campaign contributions for Siegmeister. *Id.* at 59–60. Siegmeister won the 2012 election and became State Attorney in 2013. Doc. 237 at 110. According to Siegmeister, "O'Steen's support was instrumental in [his] winning Dixie County." Doc. 240 at 59.

Because of O'Steen's help on the campaign trail, Siegmeister felt indebted to him. Doc. 240 at 74, 91. So Siegmeister did favors for O'Steen on cases that O'Steen was handling. *Id.* at 91. One such favor requested by O'Steen was for pretrial intervention (PTI or diversion)[2] for Tong.

---

[2]Pretrial intervention is a diversionary program run through the State Attorney's Office. Doc. 237 at 172. It is reserved for low-level, first-time offenders. *Id.* at 172–73.

In early 2018, the State had charged Tong and two others with operating an illegal gambling business. Gov't Ex. 82. Tong retained O'Steen to represent him and the other two defendants by paying a $15,000 retainer. Gov't Exs. 65–67. O'Steen and Siegmeister believed that Tong did not have a prior criminal history, and "[a]n adjudication of guilt is a big deal for a person who doesn't have any priors." Doc. 240 at 186–87. O'Steen knew that it was a "big deal" for Tong not to be convicted; in fact, he told Siegmeister that Tong wanted to try to run a business back in California and an adjudication of guilt and probation would be problematic for that. Doc. 240 at 184, 187. Indeed, as discussed below, it was such a big deal for Tong to avoid being convicted of the illegal gambling offense that he was willing to pay $60,000 for diversion. *Id.* at 187.

On August 17, 2018, Tong met with O'Steen. Gov't Exs. 38, 38A. O'Steen told Tong that Siegmeister had a problem with Tong and was thus unlikely to agree to drop Tong's charge. Gov't Ex. 38A at 3–4. Instead, O'Steen said that he could likely get Siegmeister to drop the charges on the other two defendants and enter a deferred prosecution agreement with Tong. *Id.* at 4. Tong wanted to know what it would take to make all the charges "go away." *Id.* at 4–5. O'Steen responded by asking, "[I]f I gave you a number of sixty thousand dollars and I make yours go away completely, and you're out of

here, you can handle that without any agreement?" Gov't Ex. 38A at 5. But he added, "I don't know if it'll fly or not." *Id.* O'Steen told Tong that he would not "bribe" Siegmeister but that he would discuss the matter with Siegmeister and would get back to Tong. *Id.* at 5–6.

That afternoon, O'Steen met Siegmeister at a Walmart, and then Siegmeister drove them to his farm. Doc. 240 at 192–93. (Siegmeister raised cattle on his farm, but he was losing money on the venture. *Id.* at 71–73.) On the drive, Siegmeister asked O'Steen what Ton was paying him, and O'Steen told him $60,000. *Id.* at 193–94. "You can definitely afford one [of my bulls,]" Siegmeister retorted. *Id.* at 194. O'Steen agreed to buy a bull for $4,000, *id.* at 194–95, even though Siegmeister normally sold his bulls for $2,500, *id.* at 195. In return, Siegmeister agreed to approve diversion for Tong and drop the charges for the other two codefendants. *Id.*

After that meeting, O'Steen reported to Tong that he could "make everything go away." Gov't Ex. 43A at 2. All that Tong had to do, he said, was pay O'Steen $75,000 and sign an agreement to forfeit what the State had seized. *Id.* When Tong balked, O'Steen responded: "That's where we're at. You asked me what the number is to get a clean slate. I just told you." *Id.* Tong queried whether Siegmeister had agreed, and O'Steen answered, "I'm telling you, give me [$75,000 and] … you won't be on probation." *Id.* Tong

said he could bring about $20,000 and asked whether O'Steen wanted cash or a check. Gov't Ex. 43A at 3. O'Steen replied, "I need [75] to make all your stuff go away. I would prefer cash but however you want to do it. … See what you can do and call me back or text me and I'll call you." *Id.*

When O'Steen and Tong talked again later that evening, Tong again fretted about the amount of money and asked if O'Steen had met with Siegmeister. Gov't Ex. 44A at 2. "It has nothing to do with the State Attorney," O'Steen said. *Id.* "It's a favor that I'm burning that somebody else will be willing to pay for it." *Id.* He reiterated, "There's no bribe going on. … But you're payin' me to use the people that I know. … The lowest I'm going for that result is [$60,000]." Gov't Ex. 45A at 2. He continued that he was "not movin, budgin'" and that Tong's choices were to pay the money, take probation, or go to trial and probably lose. *Id.* And O'Steen again told Tong, "I'm not burnin' up a favor that I … can get somebody to pay for good money to make cases go away. I'm not gon' burn that favor up." *Id.* at 3. When Tong pressed O'Steen for assurances that Siegmeister would agree to diversion, O'Steen snapped, "I'm not having this conversation and I'm not bribing the State Attorney. He's helping me either way." *Id.* "But if you don't trust me," O'Steen told Tong, "I'll try and send you somewhere else, but you're not gone' get the results." *Id.* at 4.

8

Three days later, at an in-person meeting, O'Steen again laid out Tong's options: Tong and the other two defendants could get probation for the $15,000 Tong had paid but they would have criminal records; or Tong could pay the State for its investigation and pay O'Steen $60,000 and the charges would be dropped. *See* Gov't Ex. 39A. O'Steen explained that the second option was "the best way" if Tong did not "want criminal records." *Id.* at 8.

The next morning, Tong texted O'Steen, "Here is the deal. I can bring you $30,000 on Wednesday after 3pm and Sunday I bring you another $30,000[.] [T]hat's the best I can do." Gov't Ex. 15 at 21. Later that afternoon, Siegmeister texted O'Steen asking if they were "on for a resolution." Gov't Ex. 15 at 22. O'Steen responded, "Send me deferred pros agreement please." *Id.* Siegmeister replied that he had not done it yet because O'Steen had told him he was "waiting on [his] client and Mr[.] Green," but that he would do it if they had a deal.[3] Gov't Ex. 15 at 22. O'Steen told Siegmeister that he would call tomorrow, and Siegmeister asked, "Does this mean you have your money?" *Id.* "Should have tomorrow. I'll let you know for sure tomorrow," O'Steen answered. *Id.*

A couple of days later, Tong met O'Steen at a car dealership and gave

---

[3]"Mr. Green" is a euphemism for "getting paid" from a scene in the movie *The Lincoln Lawyer*. *See* Doc. 240 at 204–05.

him $30,000 cash. Gov't Ex. 40. Over the next few days, Tong repeatedly asked O'Steen about the PTI agreement and said that he planned to hold up paying the remaining $30,000 until he saw the agreement. Gov't Ex. 15 at 25–26. On Monday, August 27, O'Steen asked Siegmeister when he would have the PTI agreement, and Siegmeister said that he would get it to O'Steen the next day. Gov't Ex. 15 at 26. O'Steen then told Tong that he would have the agreement the next day. *Id.* O'Steen then texted Siegmeister, "Looking at picking up bull September 12." *Id.* On September 4, Tong delivered the outstanding $30,000 to O'Steen. Gov't Ex. 51.

The following week, O'Steen and his father picked up the bull from Siegmeister. Doc. 239 at 225–26; Gov't Ex. 72. To pay for the bull, O'Steen gave Siegmeister a $4,000 check written from his father's business account. Doc. 239 at 228. Later that day, $4,000 in cash was deposited into O'Steen's father's bank account. Doc. 246 at 140–43. O'Steen then sold the bull to a farmer at a loss. Doc. 239 at 171.

**B.      O'Steen fails to report Tong's cash payments until after he finds out that the FBI is investigating him, over eight months after he had received the cash.**

What O'Steen and Siegmeister did not know at the time, however, was that the $60,000 in cash that Tong had given O'Steen had come from the FBI, which had enrolled Tong as a confidential source. Doc. 238 at 14, 39. In

October 2018, Siegmeister learned that the FBI wanted a copy of Tong's diversion agreement. Doc. 240 at 232–33; Gov't Ex. 15 at 37. Thinking the FBI was investigating O'Steen for laundering the payment from Tong, Siegmeister called O'Steen and warned him that the FBI had asked for a copy of the diversion agreement and said, "I hope your end of things is documented." Doc. 240 at 233. O'Steen told Siegmeister "not to sweat it; it was taken care of." *Id.*

On May 8, 2019, the FBI went overt with its investigation into Siegmeister and O'Steen, executing search warrants and seizing cellphones. Doc. 238 at 42–43; *see also* Doc. 240 at 250. Six days later, O'Steen filed Form 8300s for the two $30,000 cash payments he had received from Tong some eight months before. Doc. 246 at 157–160; Gov't Ex. 108.

Federal law requires a Form 8300 to be filed by any business that receives over $10,000 in cash. Doc. 246 at 148. The business must file the form within 15 days after receiving the cash. *Id.* at 153. (Florida has a similar reporting requirement. *Id.* at 164–65.) In April 2013, O'Steen took a continuing-education course that instructed that a lawyer is required by law to "reveal cash over ten thousand dollars even though it is very bad for the client to tell the federal government that you got ten thousand dollars in cash from them." Gov't Exs. 113, 113A. Also, on October 19, 2017, O'Steen wrote two

checks to the same payee, each for $9,999.99. Doc. 246 at 177–78. And, on October 19, 2018, O'Steen handed a bank teller $9,900 in cash and asked, "How much until the IRS finds out?" Doc. 245 at 228–29. The bank teller tried to give him a pamphlet on the currency-transaction-reporting requirements (Gov't Ex. 104), but O'Steen brushed it aside, saying that he already knew what it said. Doc. 245 at 229.

## II. O'Steen's Trial

## A. The district court allows expert testimony about the impropriety of O'Steen's $60,000 fee under the Florida Rules of Professional Conduct but gives a limiting instruction after that testimony and again before jury deliberations.

At trial, over O'Steen's objection, the United States' expert, Scott Richardson, testified that O'Steen's actions violated Florida rules of professional conduct. *See* Doc. 246 at 48–68. He explained that he had reviewed recorded conversations between O'Steen and Tong and opined that the $60,000 fee violated the rule barring excessive fees and the rule barring contingency fees for representing defendants in criminal cases. *Id*. at 49–52.

After the United States completed its direct examination of Richardson, the court instructed the jury:

> Ladies and gentlemen, you have heard some evidence that the defendant may have violated certain rules of the Florida Bar regulating the ethical practice of law, and you may hear more discussion about that. I instruct you that you may consider this

evidence in deciding whether the defendant is guilty of any crime charged in the indictment; however, it is very important that you remember that violating Florida Bar regulations or Florida Bar ethical rules does not constitute a criminal offense. And you may not convict the defendant of any crime solely because you find or believe that he has violated regulations or rules of ethics.

Doc. 246 at 68. The court gave a similar instruction at the end of trial. Doc. 160 at 10.

## B.   The court discusses the jury instructions with the parties and O'Steen agrees to most of the court's proposed instructions— including the extortion instruction.

Before the charge conference, the court gave the parties copies of its proposed jury instructions. Doc. 159; Doc. 246 at 274; Doc. 247 at 7. Then, at the charge conference, defense counsel stated that he agreed with all of the court's proposed jury instructions except for "some quibbles on instructions 16, 18, 19, and 21."[4] Doc. 247 at 8. The court discussed those "quibbles" with the parties. *Id*.

For the court's proposed jury instructions 16 (count one: use of a facility of interstate commerce for unlawful activity), 18 (count two: conspiracy to interfere with commerce by extortion), and 19 (count three: interference with commerce by extortion), defense counsel asked the court to include his "quid

---

[4]O'Steen had an attorney at trial whose primary purpose was to make a record for appeal. *See, e.g.*, Doc. 238 at 16–18. That counsel handled the jury instructions. Doc. 247 at 7–33.

pro quo" instruction. Doc. 247 at 11. The court pointed out that it had

included the requested instruction as part of instruction 16, and defense

counsel agreed that was satisfactory. *Id*. at 11–12. Defense counsel then asked

the court to insert that same instruction into instructions 18 and 19. *Id*. at 16.

After some back and forth, the court decided to give the requested "quid pro

quo" instruction as a new instruction—instruction 20—which would apply to

counts one, two, and three. *Id*. at 23–24. With that change, defense counsel

agreed that the court's proposed instructions on Hobbs Act extortion were

acceptable to O'Steen. *Id*. at 25.

The court's proposed jury instruction 21 read:

Count Four charges the Defendant with failing to file a Form 8300
with the Financial Crimes Enforcement Network as required by
law. It is a federal crime under certain circumstances for anyone to
knowingly evade a currency-transaction reporting requirement.

Title 31, United States Code, Section 5331 provides that any
person who is engaged in a trade or business, and who, in the
course of such trade or business, receives more than $10,000 in
coins or currency in one transaction shall file a report with respect
to such transaction with the Financial Crimes Enforcement
Network at such time and manner as prescribed by regulation.

Pursuant to Section 5331(b), the Secretary of Treasury has
promulgated a regulation requiring a trade or business that
receives more than $10,000 in coins or currency in one transaction
to file, within 15 days of the transaction, a Form 8300 with the
Financial Crimes Enforcement Network.

The Defendant can be found guilty of this crime only if all the
following facts are proved beyond a reasonable doubt:

(1) That, at the time specified in the indictment, the Defendant was engaged in a trade or business;

(2) that, in the course of that trade or business, the Defendant knowingly received more than $10,000 in currency in one transaction;

(3) that the Defendant failed to file a Form 8300 with the Financial Crimes Enforcement Network within 15 days after receiving the currency; and

(4) that the Defendant acted willfully, that is, he had knowledge of the currency transaction reporting requirements and failed to file a Form 8300 for the purpose of evading those reporting requirements.

Doc. 159 at 39–40.

Defense counsel asked the court to add "[i]ncluding knowledge that the form was required to be filed within 15 days after receipt of the currency" to element four of that instruction. Doc. 247 at 26. The court rejected that request, explaining that the instruction "sets out what the reporting requirements are and it tells the jury that for them to find that the defendant acted willfully, he has to have knowledge of those currency reporting requirements." *Id.* at 30. The court continued, "I don't think I need to emphasize the specific one again." *Id.*

At the end of the charge conference, defense counsel reiterated that, except for the specific objections he had made, "the defense accepts all the instruction as we've agreed to here today." Doc. 247 at 33. The court then

made the discussed changes and gave them back to the parties for approval. *See id.* at 35. After reviewing those instructions, defense counsel said that they were "fine" and what he had "agreed to[,] … subject to the objections [he had] made … before." Doc. 247 at 36.

### *Standards of Review*

I.     This Court reviews a district court's decision not to exclude relevant evidence under Federal Rule of Evidence 403 for an abuse of discretion. *United States v. Knowles*, 889 F.3d 1251, 1255 (11th Cir. 2018). In reviewing whether evidence was properly admitted under Rule 403, this Court examines the evidence "in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Brown*, 441 F.3d 1330, 1362 (11th Cir. 2006).

II.    Under the invited-error doctrine, this Court does not review a jury instruction when the defendant agrees to the instruction. *United States v. Burnette*, 65 F.4th 591, 599 (11th Cir. 2023). When the defendant does not agree to the instruction but simply fails to object to it, this Court reviews the instruction only for plain error warranting relief. *Id.*

III.   This Court reviews jury instructions "*de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party," but it gives "district courts wide discretion as to the style and wording

employed." *United States v. Maitre*, 898 F.3d 1151, 1157 (11th Cir. 2018). (internal quotation marks omitted).

IV.    This Court reviews de novo the district court's denial of a motion for judgment of acquittal based on sufficiency of the evidence, viewing the evidence in a light most favorable to the jury's verdict and making all reasonable inferences and credibility determinations in favor of the verdict. *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005). The evidence is sufficient "so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt." *United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004).

V.    This Court reviews de novo issues of constitutional law, including whether Congress has improperly delegated its legislative authority. *United States v. Ambert*, 561 F.3d 1202, 1205 (11th Cir. 2009).

## Summary of the Argument

I.    The district court did not abuse its discretion in allowing the United States' expert to testify that O'Steen had violated the Florida Bar rules and ethical regulations by charging Tong a $60,000 fee. To prove extortion, the United States had to prove that O'Steen's taking $60,000 from Tong was wrongful. The expert's testimony that the fee violated the Florida Bar's Rule of Professional Conduct because it was excessive and an improper contingency

fee was critical to establishing that element. And the limiting instructions that the court gave eliminated any risk that the jury would convict O'Steen simply because he had violated the Florida Bar's rules.

II.    The invited-error doctrine bars O'Steen's challenges to the extortion jury instruction. The district court proposed jury instructions, and after the court addressed O'Steen's only concern with the extortion instruction, O'Steen agreed to that instruction in its entirety. So under this Court's precedent, the doctrine of invited error applies.

But, even if the invited-error doctrine did not apply, plain-error review would apply because O'Steen did not object below. And he has not met his burden of showing that he is entitled to relief under plain-error review. He argues that the instruction charged an invalid legal theory and constructively amended the indictment. But he has not shown that either claimed error is plain under controlling precedent. Nor has he shown that the instruction on the purportedly invalid legal theory affected his substantial rights.

First, the jury instructions did not plainly constructively amend the indictment. At most, the instructions altered the means by which O'Steen extorted Tong. This Court has never held that altering the means—rather than the elements—of an offense constructively amends the indictment, and other Circuits have held that it does not.

Second, the jury instructions did not plainly charge an invalid legal theory because it did not plainly instruct that O'Steen could have committed extortion under color of official right as a principal. The jury instruction as a whole allowed the jury to convict him only as an aider-and-abettor, and, regardless, it is not plain that a private citizen cannot be a principal to extortion under color of official rights in some cases. In any event, he has not established that the purported error affected his substantial rights because the jury also unanimously found that he had committed extortion through the wrongful use of actual or threatened force, violence, or fear—a legally valid theory, and sufficient evidence supports that determination.

III.    The district court did not abuse its discretion in wording the jury instruction on willfully failing to timely report a cash transaction over $10,000. The instruction informed the jury of the cash-transaction-reporting requirements, including that a Form 8300 had to be filed within 15 days of receipt of over $10,000 in cash. It then instructed the jury that, to convict O'Steen, it had to find that he "acted willfully, that is, he had knowledge of the currency transaction reporting requirements and failed to file a Form 8300 for the purpose of evading those reporting requirements." Those instructions adequately stated the willfulness requirement, and therefore the court acted well within its discretion by rejecting the wording proposed by O'Steen.

IV.    Viewing the evidence in the light most favorable to the verdict, the district court properly denied O'Steen's motion for judgment of acquittal on count four because the evidence showed that O'Steen knew of the reporting requirements for a cash transaction over $10,000. The evidence showed that O'Steen, an attorney, knew generally that he had to report when he received over $10,000 in cash yet did not file the required form for many months, until soon after learning that the FBI was investigating him. As the district court found, that evidence sufficiently supports the jury's inference that O'Steen knew he had failed to report the cash transaction in the required time frame.

V.    Congress did not unconstitutionally delegate its legislative authority in 31 U.S.C. § 5331. This Court has already held that a materially similar delegation under the Bank Secrecy Act, of which § 5331 is a part, did not violate the non-delegation doctrine. But even if this were an open question, § 5331 does not violate the non-delegation doctrine. The statute leaves to the Secretary of the Treasury's discretion only ministerial details to fill in, consistent with Congress's defined goal of requiring trades and businesses to report receipt of over $10,000 in cash to ferret out criminal activity.

## Argument and Citations of Authority

**I.    The district court did not abuse its discretion by
allowing the United States' expert to testify that
O'Steen had violated the Florida Bar's rules and
ethical regulations while giving a limiting instruction
about how the jury could use this testimony.**

At trial, the United States' expert, Scott Richardson, testified that, in his

opinion, the $60,000 fee O'Steen had charged Tong violated the Florida Rule

of Professional Conduct barring excessive fees and barring contingency fees for

representing defendants in criminal cases. Doc. 246 at 49–52. That evidence

was relevant to establish the wrongfulness of O'Steen's taking of the property,

which is necessary to prove extortion, and the limiting instruction the court

gave eliminated any potential prejudice to O'Steen. Thus, the district court did

not abuse its discretion in allowing the expert testimony under Fed. R. Evid.

403.

Evidence is relevant, and therefore admissible, if "it has a tendency to

make a fact more or less probable than it would be without the evidence; and

… the fact is of consequence in determining the action." Fed. R. Evid. 401. A

court may exclude relevant evidence if "its probative value is substantially

outweighed by the danger of unfair prejudice, confusing the issues, [or]

misleading the jury." Fed. R. Evid. 403. But a court's discretion to exclude

evidence under Rule 403 is narrowly circumscribed and should be used

sparingly. *See United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992).

The balance under Rule 403 should be struck in favor of admissibility. *See*

*United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990).

The question implicated by Rule 403 is not whether the evidence is

prejudicial but whether its probative value is substantially outweighed by the

danger of unfair prejudice. *Fortenberry*, 971 F.2d at 721. Naturally, "[a]ll

evidence which tends to establish the guilt of the defendant is, in one sense,

prejudicial to that defendant." *Terzado-Madruga*, 897 F.2d at 1119 (internal

quotation marks and citation omitted). Damaging or prejudicial evidence need

not be excluded; it is only evidence that is unfairly prejudicial, with prejudice

substantially outweighing probative value, that must be excluded. *Id.* "The

term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of

some concededly relevant evidence to lure the factfinder into declaring guilt on

a ground different from proof specific to the offense charged." *Old Chief v.*

*United States*, 519 U.S. 172, 180 (1997).

Here, to convict O'Steen of extortion through use of fear, the United

States had to prove that his taking $60,000 from Tong was wrongful. That's

because the Supreme Court has interpreted the term "wrongful" in the Hobbs

Act to "limit[] the statute's coverage to those instances where the obtaining of

the property would itself be 'wrongful' because the alleged extortionist has no

lawful claim to that property." *United States v. Enmons*, 410 U.S. 396 (1973); *see also United States v. Pendergraft*, 297 F.3d 1198, 1205 (11th Cir. 2002) ("[T]he Supreme Court interpreted 'wrongful,' within the meaning of the Hobbs Act, to consist of using a wrongful means to achieve a wrongful objective."). In other words, "[e]xtortion requires an intent to obtain that which in justice and equity the party is not entitled to receive." *Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1159 (11th Cir. 2019). So to separate O'Steen's action from simply "hard bargaining" for the value of his legal services, the United States had to show that O'Steen was not entitled to receive the $60,000 payment.

That's where Richardson's testimony comes in. He explained that the Florida Rules of Professional Conduct prohibit excessive fees in general and contingency fees—"a fee that is dependent on the results or outcome of the matter"—for representing defendants in criminal cases. Doc. 246 at 49–52. Richardson testified that the $60,000 fee was excessive for the amount of work that O'Steen had done in Tong's case and also was an impermissible contingency fee.[5] *Id.* at 49–68. That testimony helped establish that O'Steen's

---

[5]To the extent that O'Steen now contends that it was improper for Richardson to testify that O'Steen had violated ethical rules, *see* O'Steen's brief at 39, he did not object on that basis below, so plain-error review applies. O'Steen points to no controlling authority showing that this testimony is

collecting $60,000 was a wrongful objective because, as a licensed attorney, he had an obligation to conform himself to the rules of professional conduct. Because this evidence was used by the United States to prove an essential element of its case, its probative value was high. *See United States v. Smith*, 685 F.2d 1293, 1296 (11th Cir. 1982).

On the other hand, the potential for *unfair* prejudice was low, if not non-existent. O'Steen simply asserts—without explanation—that Richardson's testimony was not relevant to establish any elements of Hobbs Act extortion. But, as we just explained, the evidence was not only relevant but critical to proving the extortion element. Thus, the admission of this evidence did not cause him unfair prejudice. *See United States v. Sunmonu*, 859 F. App'x 431, 434 (11th Cir. 2021) ("[T]he evidence that Sunmonu reached for the gun did not cause him unfair prejudice because it was evidence that proved the charged offense rather than 'lur[ing] the factfinder into declaring guilt on a ground different from proof specific to the charged offense.'") (citing *Old Chief*, 519 U.S. at 180).

Further, the court's instructions to the jury eliminated any potential for the jury to unfairly convict O'Steen because he had violated the ethical rules rather than having committed extortion. *See United States v. Brown*, 665 F.3d

improper; instead relying on dicta from a Third Circuit opinion.

1239, 1247 (11th Cir. 2011) ("A limiting instruction can diminish any unfair prejudice caused by the evidence's admission."). The court specifically and repeatedly instructed O'Steen's jury that, although it could "consider this evidence in deciding whether the defendant is guilty of any crime charged in the indictment," it could not "convict the defendant of any crime solely because [it] find[s] or believe[s] that he has violated regulations or rules of ethics." *See* Doc. 246 at 68; Doc. 160 at 10.

There is no reason why the jury could not have followed the limiting instructions here. *See United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011) (this Court "presume[s] that jurors follow the instructions given by the district court."). Although O'Steen recognizes this general rule, he says it does not apply here. But he bases that assertion on cases in which there was a *Bruton*[6] error. *See* O'Steen's brief at 54–55. *Bruton* "held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987). *Bruton* thus created a narrow exception to the fundamental principle that jurors are presumed to follow instructions to consider evidence only for particular

---

[6]*Bruton v. United States*, 391 U.S. 123, 125 (1968).

purposes because nontestifying co-defendant confessions that "expressly implicat[e]" the defendant are so "powerfully incriminating" that a jury cannot help considering the confession against the defendant. 391 U.S. at 124 n.1, 135–136.

The testimony here is nothing like a nontestifying co-defendant implicating the defendant. Thus, the fundamental principle that jurors are presumed to follow instructions to consider evidence only for particular purposes applies. Indeed, this case is like *United States v. Crabtree*, 878 F.3d 1274, 1287–88 (11th Cir. 2018), where this Court rejected an argument that admitting testimony about Medicare rules and regulations effectively lowered the burden of proof for conviction. *Id.* at 1287. Implicitly concluding that the jury would follow the limiting instructions the district court gave, this Court held that the district court did not abuse its discretion in admitting that testimony because that evidence was relevant and the district court twice gave a limiting instruction explaining that violating Medicare rules and regulations was not a crime. *Id.* at 1287–88. Like the jury in *Crabtree*, the jury here could follow the limiting instructions.

Because Richardson's testimony was highly probative and the limiting instruction mitigated any risk of unfair prejudice, the district court did not abuse its discretion by allowing his testimony. *See Crabtree*, 878 F.3d at 1287–

88; *see also United States v. Marti*, 294 F. App'x 439, 446 (11th Cir. 2008)

(district court did not abuse its discretion in admitting evidence of the

defendant's violation of regulations because that evidence was relevant to

proving the charged crime and the court gave an adequate limiting instruction).

Richardson's testimony does not require a new trial here.

## II. The invited-error doctrine bars O'Steen's challenges to the jury instruction on count three (Hobbs Act extortion) because he agreed to that instruction, and, even if it does not, O'Steen has not established his right to relief under plain-error review.

Despite having agreed to the district court's proposed jury instruction on

the substantive extortion charge, O'Steen now argues for the first time that the

instruction charged an invalid legal theory and constructively amended the

indictment. But this Court does not review an error that the appellant invited,

which is what O'Steen did by agreeing to the district court's proposed jury

instructions. And even if he had not invited the error, he did not object below

and has failed to carry his burden of proving his right to relief under plain-error

review.

## A. The invited-error doctrine bars O'Steen's challenges because he agreed to the extortion jury instruction he now challenges.

"It is a cardinal rule of appellate review that a party may not challenge as

error a ruling or other trial proceeding invited by that party." *United States v.*

*Ross*, 131 F.3d 970, 988 (11th Cir. 1997). "Under [this Court's] precedent, 'when a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result.'" *United States v. Feldman*, 931 F.3d 1245, 1260 (11th Cir. 2019) (citing *United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010)). This Court has recently explained that it has "drawn some pretty fine lines distinguishing between invited and merely-unobjected-to errors in jury instructions," but reiterated that a defendant invites an error in a jury instruction when his counsel expressly agrees to that instruction. *United States v. Burnette*, 65 F.4th 591, 601 (11th Cir. 2023).

This case falls on the invited-error side of the line. Before giving the instruction, the court reviewed its proposed instructions with the parties, and, at the outset, defense counsel said that he mostly agreed with them except for "some quibbles." Doc. 247 at 8. For the Hobbs Act extortion instruction, that quibble was about the inclusion of a "quid pro quo" instruction, and the court resolved that objection to O'Steen's satisfaction. *Id.* at 16–24. After that, defense counsel agreed that the court's proposed extortion instruction was acceptable. *Id.* at 25. And, at the end of the charge conference, defense counsel reiterated that, except for the issue he had preserved for appeal, "the defense accepts all the instruction as we've agreed to here today." *Id.* at 33. Through all

these statements agreeing to the court's proposed instruction on extortion, O'Steen invited the purported errors. *See United States v. Carter*, 776 F.3d 1309, 1323 (11th Cir. 2015) ("Because Carter's defense counsel at trial agreed to the jury instructions … after the district court sustained his only objection to those instructions, Carter has waived his right to appeal the jury instructions …, even if the instructions constituted plain error."); *Feldman*, 931 F.3d 1245, 1260 (11th Cir. 2019) (invited-error doctrine barred claim that jury instruction constructively amended the indictment where court read its proposed instruction and defense counsel said "that's fine"). Thus, this Court should decline to review O'Steen's challenges to the extortion jury instruction.

**B.      But if this Court reviews O'Steen's newly raised challenge, it should conclude that O'Steen has not established his right to relief under plain-error review.**

O'Steen has the difficult burden of establishing his right to relief under plain-error review. *See Greer v. United States*, 141 S. Ct. 2090, 2097 (2021). To do so, he had to show "(1) an error has occurred, (2) the error was plain, and (3) the error affected substantial rights." *United States v. Gonzalez*, 834 F.3d 1206, 1218 (11th Cir. 2016). In order to establish that the asserted error is plain error, he had to show that the error was clear and obvious under controlling law by pointing to "precedent from the Supreme Court or this Court directly resolving the issue." *United States v. Sammour*, 816 F.3d 1328, 1337 (11th Cir.

2016). To show substantial prejudice, he had to show "a reasonable probability of a different result but for the error." *Burnette*, 65 F.4th at 603. Even if he had satisfied all three conditions, however, this Court may notice the forfeited error only "if (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks and alterations omitted).

"It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Jones v. United States*, 527 U.S. 373, 389 (1999) (internal quotation marks omitted). As explained below, this is not that rare case.

*(1)* *O'Steen has not shown that the jury instruction's inclusion of extortion by force or violence plainly constructively amended the indictment.*[7]

The Fifth Amendment to the Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. This clause does not "permit a defendant to be tried on charges that are not made in the indictment against him" or convicted on theories that the indictment

---

[7]O'Steen asserts constructive amendment as part of his argument that the United States has not shown that the jury instruction on the purportedly invalid legal theory was harmless. We discuss that argument below. But, because constructive amendment of the indictment would be an independent basis for reversal, we discuss it separately here.

"cannot fairly be read as charging." *Stirone v. United States*, 361 U.S. 212, 217,

(1960). A constructive amendment occurs "when the essential elements of the

offense contained in the indictment are altered to broaden the possible bases

for conviction beyond what is contained in the indictment." *Sammour*, 816

F.3d at 1337 (citation omitted).

The essential elements of Hobbs Act extortion are: (1) the defendant

caused a person to part with property knowingly by using extortion; and (2) the

extortionate transaction delayed, interrupted, or affected interstate commerce.

18 U.S.C. § 1951(a); *see also United States v. Harris*, 916 F.3d 948, 954 (11th Cir.

2019) (Hobbs Act extortion "contains two elements: (1) extortion, and (2)

interference with interstate commerce."). Extortion can be committed by the

alternative means of "wrongful use of actual or threatened force, violence, or

fear" or "under color of official right." *See id*.

The indictment charged that O'Steen and Siegmeister, "aiding and

abetting each other, did knowingly obstruct, delay, and affect, and attempt to

obstruct, delay, and affect… commerce by extortion, as such terms are defined

in 18 U.S.C. § 1951, that is, the defendants …. obtained property … under

color of official right and through fear of economic harm." Doc. 1 at 14.

Consistent with the indictment, the jury instruction stated that, to find O'Steen

guilty, the jury had to find beyond a reasonable doubt that he had caused Tong

to part with property "knowingly by using extortion or extortion under color of official right," and it defined extortion as "obtaining property from a person who consents to give it up because of the wrongful use of actual or threatened force, violence, or fear." Doc. 160 at 27.

O'Steen has not shown that this instruction plainly constructively amended the indictment. O'Steen contends that the definition expanded the essential elements of Hobbs Act extortion because the indictment had limited the extortion element to "under color of official right and through fear of economic harm," pointing to the "that is" clause in the indictment. O'Steen's brief at 27–28. But that clause just identified the means by which O'Steen had committed extortion, *see Harris*, 916 F.3d at 954; it did not alter the essential elements of the offense. O'Steen identifies no precedent establishing that a constructive amendment occurs when the jury instructions alter the means of committing an offense rather than the elements. And other circuits have held that "[a]ltering a means does not constructively amend the indictment… because it does not alter an 'essential element' of the crime such that 'the defendant may have been convicted of an offense other than that charged in the indictment.'" *Sammour*, 816 F.3d at 1338 (collecting cases). Thus, any error would not be plain. *See id*. ("Because the law in this Circuit is unsettled and other courts have rejected Sammour's argument, we cannot say that the district

court plainly erred [by adding an additional means of committing the offense].").

And, although this Court need not reach this issue, those other circuits are correct, so there is no error here at all. *United States v. Benitez*, 732 F. App'x 783 (11th Cir. 2018), shows why. In that case, the grand jury had charged the defendant with bank robbery with a dangerous weapon, "that is a firearm." *Id.* at 785. But, over the defendant's objection, the district court instructed the jury that it could find the defendant guilty if it found that the defendant had used any dangerous weapon, not just a firearm. *Id.* at 790–91. This Court held that the jury instructions did not constructively amend the indictment, explaining that the removal of the firearm phrase did not broaden the essential elements of the robbery offense as charged in the indictment because the type of dangerous weapon is not an element of the offense. *Id.* at 792. So too here. The type of extortion is not an element of Hobbs Act extortion, so the court was not required to limit the definition of extortion to be consistent with the "that is" clause in the indictment.

Finally, to the extent that this Court held in *United States v. Narog*, 372 F.3d 1243 (11th Cir. 2004), that constructive amendment occurs when the indictment alleges a subset of an offense and the jury instruction is not limited to that subset, that holding—if it survives at all—does not apply beyond

*Narog*'s particular facts and circumstances. *See Sammour*, 816 F.3d at 1337

("*Narog* does not plainly extend to other crimes or circumstances."). And, even

on *Narog*'s facts and circumstances, this Court later held that *Narog* conflicted

with prior precedent and is thus not good law. *United States v. Nunez*, 1 F.4th

976, 990–91 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 2675 (2022); *see also United

States v. Colston*, 4 F.4th 1179, 1188–89 (11th Cir. 2021) ("We have made clear

that *Narog*'s subset analysis, along with its demand for a hyper-technical

parsing of every indictment, is not good law."). So *Narog* does not establish

error here, let alone plain error.

**(2)      O'Steen has not shown that the district court plainly erred in instructing the
jury on extortion under color of official right or that the purported error
affected his substantial rights.**

O'Steen argues that the district court instructed that he could be

convicted of committing extortion under color of official right as a principal,

and that instruction was plainly erroneous because a private citizen cannot

commit extortion under color of official right. His argument fails at two levels.

First, his argument cherry-picks one phrase in the instruction and ignores the

rest of the instruction, which makes clear that O'Steen could have been

convicted only of aiding and abetting Siegmeister's extortion under the color of

official right. Second, he has failed to show that it is plain under controlling

precedent that a private citizen cannot commit extortion under color of official

right.

Starting with the former, the jury instructions precluded the jury from finding that O'Steen had committed extortion under color of official right as a principal. The court instructed the jury, "Extortion under color of official right is the wrongful taking or receipt of money or property *by a public officer* who knows that the money or property was taken or received in return for doing an official act." Doc. 160 at 28 (emphasis added). There was only one public officer here: State Attorney Siegmeister. To be sure, the introduction to the instruction stated that "Count Three charges the Defendant with committing or aiding and abetting the commission of the substantive offense of interfering with commerce by extortion," but that prefatory "committing" language did not purport to set out the elements of the offense or otherwise call for the jury to disregard the "public officer" element of the offense as instructed.

"Jury instructions need not be perfect, and [this Court] review[s] the instructions in light of the 'entire charge' and do[es] not isolate individual statements in order to contrive error." *United States v. Ruan*, 56 F.4th 1291, 1296 (11th Cir. 2023). When viewed alongside the definition of "extortion under color of official right," the jury instruction left no room to convict O'Steen as a principal because he is not a public officer. So the jury could have convicted him only if it found that he had aided and abetted Siegmeister. Thus,

even if the introduction were imprecise, that would not render the instruction as a whole erroneous, and certainly not plainly so.[8]

In any event, even if the instructions could be read as allowing the jury to convict O'Steen as a principal—which as explained above, they cannot—O'Steen has not established that instruction to be plainly erroneous. O'Steen cites no controlling precedent holding that a private citizen cannot be a

---

[8]In arguing that the error here was not harmless, O'Steen contends that there was insufficient evidence that he had aided and abetted Siegmeister's extortion under color of official right. But that's a separate question from whether the jury instruction charged a valid legal theory. Because the jury instruction was not plainly erroneous and O'Steen does not independently challenge the sufficiency of the evidence, this Court need not and should not reach the sufficiency of the evidence of aiding and abetting. But regardless, sufficient evidence supports that O'Steen aided and abetted Siegmeister's extortion under color of official right. The evidence showed that, when Siegmeister learned that Tong would pay O'Steen $60,000 to get PTI, his immediate response was to tell O'Steen, "You can definitely afford one [of my bulls.]" Doc. 240 at 194. O'Steen then agreed to buy a bull for $4,000, *id.* at 194–95, even though Siegmeister normally sold his bulls for $2,500, *id.* at 195, in exchange for Siegmeister's agreeing to approve PTI for Tong. *Id.* A jury could infer that Siegmeister made this agreement in order to wrongfully receive $4,000 from the $60,000 that O'Steen took from Tong. And O'Steen aided and abetted him by acting as an intermediary. *Cf. United States v. Rosenthal*, 805 F.3d 523, 533 (5th Cir. 2015) (instruction on aiding and abetting extortion under color of official right was proper where defendant, an attorney, initiated plans to secure a judge's cooperation, instructed the judge to take judicial action at his direction, and directed a third-party to pay the judge). And, contrary to O'Steen's assertion, it is irrelevant that the jury acquitted him of the conspiracy counts; the relevant inquiry remains whether sufficient evidence exists to support the jury's guilty verdict. *See United States v. Brito*, 721 F.2d 743, 749 (11th Cir. 1983) ("[I]nconsistency in a jury's verdict does not require reversal.") (internal quotation marks omitted).

principal to extortion under color of official right. *See* O'Steen's brief at 17–23 (relying on out-of-circuit authority in support of his argument that a private citizen cannot commit extortion under color of official right). And one out-of-circuit case he cites acknowledges that "the plain meaning of the [Hobbs Act] does not clearly indicate who can act under color of official right." *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir. 1995). *Tomblin* also leaves open the possibility that some private citizens could be liable for extortion under color of official right when they masquerade as public officials, speak for public officials, or act in concert with public official. *See id*. at 1382. To the extent that O'Steen contends that the evidence did not support that he did those things, that goes to the sufficiency of the evidence; it does not make the jury instruction invalid. *See, e.g.*, *United States v. Browne*, 505 F.3d 1229, 1261 (11th Cir. 2007) (discussing the difference between a legally and factually invalid theory); *United States v. Grimsley*, 808 F. App'x 865, 870 (11th Cir. 2020) ("That there was no evidence in the record as to Gavin's criminal history rendered the aiding and abetting theory invalid as a factual matter, not a matter of law.").

To recap, the instruction on Hobbs Act extortion did not allow for the jury to convict O'Steen as a principal to extortion under a color-of-official-right theory, but, even it did, that would not have been plainly erroneous. Thus, O'Steen has not shown that the court plainly erred in instructing the jury on

that offense.

But even if he had, he still has not shown that he is entitled to relief under the third prong of plain-error review. Although O'Steen acknowledges that plain-error review applies, he argues that the United States must prove that the error in the jury instruction was harmless beyond a reasonable doubt. That's the wrong standard, applied to the wrong party. On plain-error review, the defendant has the burden of persuasion to show that the error affected his substantial rights. *United States v. Monroe*, 353 F.3d 1346, 1352 (11th Cir. 2003). The "burden of showing prejudice to meet the third-prong requirement is anything but easy." *United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005). "To show that an instructional error affected his substantial rights at Step [three] of the plain-error analysis, a defendant must show that the error was probably responsible for an incorrect verdict." *Burnette*, 65 F.4th at 603 (internal quotation marks omitted).

O'Steen cannot make that showing here because the jury also unanimously found that he had committed extortion through the wrongful use of actual or threatened force, violence, or fear. We know this because the jury

filled out a special verdict, Doc. 162 at 3:

> 6.   We, the jury, unanimously find MARION MICHAEL O'STEEN committed or aided and abetted the commission of the following (choose one):
>
> _____ Extortion
>
> _____ Extortion Under Color of Official Right
>
> \_\_\_X\_\_ Both Extortion and Extortion Under Color of Official Right

Thus, even if the district court jury had wrongly instructed the jury about extortion under color of official right, that error would not have affected O'Steen's substantial rights. *See Gonzalez*, 834 F.3d at 1225 (defendant did not show that the purported errors in the jury instruction affected her substantial rights because she did not show a reasonable probability that, but for the purported error, the jury's verdict would have been different); *United States v. Pelisamen*, 641 F.3d 399, 406 (9th Cir. 2011) (because the special verdict form showed that the jury had convicted the defendant under a both valid and invalid legal theory, the jury instruction on the invalid theory did not affect the defendant's substantial rights).

And sufficient evidence supports the jury's verdict that O'Steen obtained the $60,000 payment from Tong through wrongful use of Tong's fear. In the

extortion context, "fear" means "a state of anxious concern, alarm, or apprehension of harm," including "fear of economic loss." *Harris*, 916 F.3d at 958 (internal quotation marks, alterations, and citations omitted). O'Steen knew that Tong feared that a felony conviction would harm him financially because it would prevent him from operating his business in California, and he exploited that fear to force Tong to pay $60,000. *See* Doc. 240 at 184, 187. O'Steen told Tong that he would not use a favor with the State Attorney to get Tong PTI unless Tong paid him $60,000 and that PTI was the best option if Tong did not want a criminal record. *See* Gov't Ex. 39A at 8; Gov't Ex. 44A at 2; Gov't Ex. 45A at 2–3. He also told Tong that another attorney would not be able to obtain the same results. Gov't Ex. 45A at 4. And, as explained above, it was wrongful of O'Steen to demand that $60,000 payment because it violated the Florida Bar's prohibition on excessive fees and contingency fees for representing criminal defendants. *Cf. United States v. Vigil*, 523 F.3d 1258, 1265 (10th Cir. 2008) (defendant used wrongful economic fear by demanding a contract term that was not a legitimate objective or a genuine contract term that the defendant could rightfully demand). Simply put, it was wrong for O'Steen to sell diversion instead of his services.

O'Steen's argument to the contrary fails under this Court's precedent. He argues on pages 30–31 of his brief that his demanding and receiving a $60,000

payment for cashing in a favor to get Tong diversion was not wrongful because Tong's conduct—operating an allegedly illegal gambling business—caused Tong's fear of economic harm. *Harris* forecloses that argument. In that case, prison inmates "operated a phone scam in which they would masquerade as law-enforcement or court officials and dupe their victims into paying them for fake infractions." *Id.*, 916 F.3d at 951. Victims paid money to the inmates in the form of Green Dot numbers, and, when Harris, a corrections officer, found the numbers, he would take them from the inmates and keep them for himself. *Id.* at 951–52. In discussing the sufficiency of the evidence that Harris had wrongfully used fear to take the Green Dot numbers, this Court held, "The inmates feared economic harm as well: had their illegal conduct surfaced, their ability to continue their lucrative scam would have been threatened." *Id.* at 958. It was irrelevant that the inmates' fear resulted because they were operating an illegal scam; what mattered was that Harris had capitalized on that fear—just as O'Steen did here.

And, in any event, as in *Harris*, the jury also could have found that O'Steen had extorted Tong through Tong's fear of punishment, rather than his fear of economic harm. *See id.* at 958 (holding that "[t]he inmates also feared potential punishment"; "[i]f the inmates had refused to acquiesce in Harris's extortion, they could have been punished for possessing contraband"). *Id.* Like

those inmates, if Tong had refused to give in to O'Steen's extortion, he could have been punished for his gambling operation. Tong feared that, and O'Steen capitalized on that fear. *See, e.g.*, Doc. 247 at 134 (O'Steen telling Tong that he could pay him $60,000 and get PTI or he could "go to trial and fight 'em out," but that he did not think Tong would win). O'Steen does not dispute this and has therefore abandoned any argument that the evidence was insufficient to convict him on this ground. *See United States v. Osorto*, 995 F.3d 801, 822 (11th Cir.), *cert. denied*, 142 S. Ct. 470 (2021). And, as we explain in Section II(B)(1), his argument that this was an invalid legal theory because it constructively amended the indictment, *see* O'Steen's brief at 29–30, fails.

Thus, O'Steen has not shown that the district court plainly erred in instructing the jury on extortion under color of official right or that this purported error affected his substantial rights. And he falters at step four for essentially the same reasons. So if this Court concludes that he did not invite the purported error, it should still deny him relief from his substantive Hobbs Act extortion conviction based on his newly raised challenge to the jury instruction. O'Steen is not entitled to a new trial because of the extortion jury instruction to which he had agreed.

**III.** **The district court did not abuse its discretion in wording the jury instruction on count four (willfully failing to timely report a cash transaction over $10,000).**

The district court did not abuse its discretion by refusing O'Steen's requested wording on the willfulness requirement of the failing-to-report offense. The court rejected O'Steen's wording because the instruction set out "what the reporting requirements are" and told "the jury that for them to find that the defendant acted willfully, he ha[d] to have knowledge of those currency reporting requirements." Doc. 247 at 30. As explained below, the court was correct that the instruction adequately stated the willfulness requirement, and therefore the court acted well within its discretion by bypassing the wording proposed by O'Steen.

"A criminal defendant has no right to select the particular wording of a proposed jury instruction." *United States v. Gaines*, 690 F.2d 849, 856 (11th Cir. 1982). This Court "will not reverse a conviction unless, after examining the entire charge," it concludes "that the issues of law were presented inaccurately, the charge included crimes not contained in the indictment, or the charge improperly guided the jury in such a substantial way as to violate due process." *United States v. Maitre*, 898 F.3d 1151, 1157 (11th Cir. 2018).

Federal law requires a person who is engaged in a trade or business and

who receives more than $10,000 in cash to report that transaction "with the Financial Crimes Enforcement Network at such time and manner as the Secretary [of the Treasury] may, by regulation, prescribe." 31 U.S.C. § 5331. The governing regulation, in turn, provides that this report must be made within 15 days of the receipt of the cash. 31 C.F.R. § 1010.330(b)(1). A person who willfully fails to meet these reporting requirements commits a criminal offense. 31 U.S.C. § 5322. In the context of a § 5322 violation, willfulness requires that the defendant know of the reporting requirements and specifically intend to violate those requirements. *See Ratzlaf v. United States*, 510 U.S. 135, 142, 149 (1994).

Consistent with this law, the district court instructed the jury on the transaction-reporting requirements, specifically that the Secretary of the Treasury had "promulgated a regulation requiring a trade or business that receives more than $10,000 in coins or currency in one transaction to file, within 15 days of the transaction, a Form 8300 with the Financial Crimes Enforcement Network." Doc. 160 at 34. It then instructed the jury on the elements of the offense, including that "the Defendant acted willfully, that is, he had knowledge of the currency transaction reporting requirements and failed to file a Form 8300 for the purpose of evading those reporting requirements." Doc. 160 at 34–35. The use of the plural "reporting

44

requirements" underscored to the jury that there were multiple requirements, not just a singular requirement of reporting the cash but also doing so within 15 days. And, lifting language from *Ratzlaf*, the court further instructed that willfulness required the violation of "a known legal duty." *Id.* at 37. These instructions, viewed as a whole, make clear that, for the jury to convict O'Steen, it had to find that he knew of the currency transaction reporting requirements, including that there was time limit that he had to comply with, and had the intent to evade those requirements.

Indeed, viewing the jury instructions in the context of the evidence at trial, these instructions would not have allowed the jury to convict O'Steen without finding that he knew there was a time limit for filing the Form 8300. There was no dispute that O'Steen had filed a Form 8300; the only question was whether he had failed to do so timely. Thus, for the jury to find that O'Steen had violated "a known legal duty," it had to have found that he knew that he had a duty to file a *timely* Form 8300. There's no other legal duty he could have violated.

Thus, the district court did not abuse its discretion in determining that it did not need to give O'Steen's requested instruction because its instruction conveyed the willfulness requirement. This jury instruction also does not require a new trial.

**IV. Viewing the evidence in the light most favorable to the verdict, the district court properly denied O'Steen's motion for judgment of acquittal on count four because the evidence showed that O'Steen knew of the reporting requirements for cash transactions over $10,000.**

The district did not err in denying O'Steen's motion for judgment of acquittal. O'Steen disputed only the sufficiency of the evidence that he knew the deadline to report the cash transaction. Doc. 172 at 6. Knowledge can be proven through circumstantial evidence and the reasonable inferences drawn from that evidence. *See Ratzlaf*, 510 U.S.at 149 n.19 (noting that a "jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct"). And the court found that the jury could have reasonably inferred from O'Steen's filing of the Form 8300 immediately after learning that he was under FBI investigation that he knew that he had failed to act in conformity with the reporting requirements. Doc. 172 at 6–7.

The court was correct. The evidence shows that O'Steen was an attorney with general knowledge about transaction-reporting requirements, including the requirement to report cash transactions of over $10,000. *See* Doc. 245 at 228–29; Doc. 246 at 164–65; Gov't. Ex. 113A. The evidence also shows that O'Steen requested that Tong pay him in cash. Gov't Ex. 43A at 3. A jury could

infer that an attorney who knows he is required to report cash transactions and who is paid by his client in cash would know there is a time limit for reporting the transaction, or at the very least know that he could not wait eight months to report it. That inference is bolstered by evidence that O'Steen filed the Form 8300 soon after learning that he was being investigated by the FBI. *See* Doc. 246 at 157–160; Gov't Ex. 108. Or, to take it further, the jury could reasonably infer that he would know that merchants can't just *not* report cash transactions and instead report them only when the law is on their tail. Moreover, O'Steen has a history of attempting to evade transaction-reporting requirements, Doc. 245 at 228–29; Doc. 246 at 177–78, negating any inference that his failure to timely file the Form 8300 was because he did not there was a time limit. So the evidence supports that O'Steen knowingly failed to report the cash transaction in the required time frame.

And that is so even if there may have been other explanations for O'Steen's conduct. The jury was "free to choose among the reasonable constructions of the evidence," so "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Iriele*, 977 F.3d 1155, 1168 (11th Cir. 2020).

O'Steen's jury reasonably inferred that he knew that he had to report the

cash payment from Tong before he actually did. Sufficient evidence supports

that finding, so this Court should not disturb the jury's verdict.

### V. Congress did not unconstitutionally delegate its legislative authority in 31 U.S.C. § 5331 by requiring the reporting of the receipt of over $10,000 in cash but leaving the details of the form and timing of that report to the Secretary of the Treasury.

Article I of the Constitution provides that "[a]ll legislative Powers herein

granted shall be vested in a Congress of the United States." U.S. Const. art. I,

§ 1. "Congress may not transfer to others the essential legislative functions

with which it is vested," but it "may authorize other bodies to determine

specific facts and may also establish general standards and delegate to others

the responsibility of effectuating the legislative policy." *United States v. Sans*,

731 F.2d 1521, 1527 (11th Cir. 1984). Thus, the Supreme Court has "held,

time and again, that a statutory delegation is constitutional as long as Congress

lay[s] down by legislative act an intelligible principle to which the person or

body authorized to [exercise the delegated authority] is directed to conform."

*Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion).

This standard is "not demanding." *Id.* at 2129. To the contrary, the

Supreme Court has repeatedly rejected non-delegation challenges in cases

involving broad conferrals of authority. *See, e.g.*, *Whitman v. Am. Trucking Ass'n*,

531 U.S. 457, 473–74 (2001); *Touby v. United States*, 500 U.S. 160, 166–67

(1991); *Yakus v. United States*, 321 U.S. 414, 427 (1944). In fact, it has invalidated legislation based on the non-delegation doctrine "[o]nly twice in this country's history," and not since the New Deal. *See Gundy*, 139 S. Ct. at 2129 (plurality opinion). Thus, scholars have declared this doctrine dead. *See, e.g.*, Cass R. Sunstein & Adrian Vermeule, *Libertarian Administrative Law*, 82 U. Chi. L. Rev. 393, 419 (2015).

And, although some members of the Supreme Court favor resurrecting this doctrine, *see Gundy*, 139 S. Ct. at 2131–48 (Gorsuch, J., dissenting), this Court should not do so here. To begin with, O'Steen devotes only four sentences to his argument. Citing the *Gundy* dissent, he argues that he was "convicted of violating a *regulation*." O'Steen's brief at 55 (emphasis his). Not so. He was convicted of violating a statute in which Congress required trades or businesses to report the receipt of more than $10,000 in cash, set forth the information that must be reported, and delegated the authority to the Secretary of the Treasury to determine the time and form of reporting. *See* 31 U.S.C. §§ 5331 and 5322(a). O'Steen has not explained how that violates the non-delegation doctrine (nor may he do so, for the first time, in reply). This alone dooms his non-delegation challenge. *See United States v. Bane*, 948 F.3d 1290, 1297 (11th Cir. 2020) (failure to make argument until reply brief is fatal to claim).

In any event, O'Steen's claim is foreclosed because this Court has already held that a materially similar delegation under the Bank Secrecy Act, of which § 5331 is a part, did not violate the non-delegation doctrine. In *Sans*, 731 F.2d at 1527–28, this Court considered a provision of the Bank Secrecy Act that required reporting of transactions involving domestic financial institutions "at such time, in such manner, and in such detail, as the Secretary may require," and determined that there was "no delegation problem." *Sans* requires the same result here. *See United States v. Brown*, 342 F.3d 1245, 1246 (11th Cir. 2003) (under the prior-panel-precedent rule, this Court is bound to follow its precedent "unless and until it is overruled by this court en banc or by the Supreme Court").

But even if this were an open question, § 5331 does not violate the non-delegation doctrine. The statute articulates the general policy that trades or businesses must report receiving over $10,000 in cash and sets forth the general information that must be reported. *See id.* It authorizes the Secretary of the Treasury only to "fill up the details" of the time and form of reporting. *See id.* Even the dissent in *Gundy* recognizes that this type of ministerial delegation does not violate the non-delegation doctrine. *See id.*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting) ("[W]e know that as long as Congress makes the policy decisions when regulating private conduct, it may authorize another

branch to 'fill up the details.'") (citing *Wayman v. Southard*, 23 U.S. 1, 43 (1825)).

And the text and legislative history of the Bank Secrecy Act show that its purpose "is to require reports and records that have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." *United States v. Kattan-Kassin*, 696 F.2d 893, 896 (11th Cir. 1983). "The rationale for requiring the reporting of large currency transactions was that '[t]he deposit and withdrawal of large amounts of currency or its equivalent ... under unusual circumstances may betray criminal activity.'" *Id.* at 896–97 (citing H.R. No. 975, 91st Cong., 2d Sess.). Because Congress provided "intelligible principles" to guide the Secretary's exercise of discretion and constricted the Secretary's discretion to a narrow and defined category, Congress did not impermissibly delegate its legislative authority. *See United States v. Ambert*, 561 F.3d 1202, 1213 (11th Cir. 2009) (explaining that, under Supreme Court precedent, a statute is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority") (internal quotation marks omitted).

In sum, under the Supreme Court's and this Court's precedent, § 5331 does not violate the non-delegation doctrine. The statute leaves to the Secretary's discretion only ministerial details to fill in consistent with

Congress's defined goal. Indeed, if § 5331 is an unconstitutional delegation, "then most of Government is unconstitutional." *Gund*y, 139 S. Ct. at 2130 (plurality opinion). O'Steen is not entitled to a dismissal of the indictment on this basis.

## Conclusion

O'Steen has failed to show that any error occurred in his trial, let alone reversible error. The United States thus requests that this Court affirm the judgment of the district court.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

By:   *s/ Holly L. Gershow*
HOLLY L. GERSHOW
Assistant United States Attorney
Deputy Chief, Appellate Division
Florida Bar No. 98960
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
holly.gershow@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 12,279 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

# Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was

sent by CM/ECF on May 30, 2023, to:

MICHAEL UFFERMAN, ESQ.
BRYAN S. GOWDY, ESQ.

*Counsel for Marion O'Steen*

*s/ Holly L. Gershow*
HOLLY L. GERSHOW
Assistant United States Attorney
